HENRY O. LOPEZ, JOSEPH ZARCARO AND ANGELA ZARCARO, PLAINTIFFS-RESPONDENTS, v. NEW JERSEY BELL TELEPHONE COMPANY, A BODY CORPORATE OF THE STATE OF NEW JERSEY, DEFENDANT, AND ARTHUR J. SILLS, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT.

Argued February 5, 1968—Decided April 1, 1968.

*Mr. Joseph A. Hoffman,* Assistant Attorney General, argued the cause for appellant (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney *pro se*).

*Mr. Robert I. Ansell* argued the cause for respondents (*Messrs. Anschelewitz, Barr & Ansell,* attorneys).

The opinion of the court was delivered by

JACOBS, J. The Chancery Division ordered the Attorney General to withdraw his request that the Telephone Company discontinue services to the plaintiffs and granted a preliminary restraint against him. The Appellate Division allowed

leave to appeal but refused to stay the Chancery Division's action pending determination of the appeal. Thereafter it affirmed and we granted certification. 50 *N. J.* 88 (1967).

During 1966 the State Police investigated gambling activities in Monmouth County. Its investigation included surveillance of the Midway Stationery store, operated by the plaintiff Lopez and located at 1137 Springwood Avenue, Asbury Park, as well as the Neptune Soda Shop, operated by the plaintiffs Zarcaro and located at 1315 Corlies Avenue, Neptune Township. On several occasions Investigator Roon visited the Neptune Soda Shop and observed bets being placed there; on one occasion he placed a bet himself. Investigator Santelli visited the Midway Stationery store on several occasions and observed lottery operations being conducted there; on one occasion he tried to place some money on numbers but was told that he was a stranger and that in any event numbers were being received "later on."

On September 23, 1966 detailed affidavits of their observations were submitted by the investigators to Judge Kingfield who, after finding probable cause, issued warrants authorizing searches of the Neptune Soda Shop and the Midway Stationery store. The warrants directed that if the illegal practices commonly known as bookmaking and lottery were found being carried on in the described premises, "all property, including monies" which were being used as the means of carrying them on were to be seized for disposition according to law. On September 27, 1966 gambling raids and searches were conducted in many Monmouth County establishments including those operated by the plaintiffs.

At the Neptune Soda Shop, the search resulted in the seizure of many slips of papers containing notations of number plays and horse race bets, along with copies of racing sheets and substantial sums of money hidden in various parts of the store. The investigators found a private telephone on the rear wall and a public telephone booth immediately outside the premises; although the telephones had different call numbers they had been illegally interconnected

and rang simultaneously. At the Midway Stationery store, paper bags filled with number slips were seized along with substantial sums of money, some of which was found hidden in various parts of the store; in a back room, the investigators found tables, chairs and a private telephone. While they were there the telephone rang and a party asked for "John" but hung up when told that he was busy. Following the searches and seizures at Neptune and Midway, appropriate complaints were filed for violations of the laws against bookmaking and lotteries. See *N. J. S.* 2A:112–3; *N. J. S.* 2A:121–3. The ultimate dispositions of the complaints are not set forth in the record before us and are not in any event controlling or material here. *Cf. In Re Rosner*, 24 *Misc.* 2d 981, 205 *N. Y. S.* 2d 476, 476–477 (*Sup. Ct.* 1960); *Rubin v. Pennsylvania Public Utility Commission*, 197 *Pa. Super.* 157, 177 *A.* 2d 128, 131 (*Super. Ct.* 1962).

The overall supervision of the gambling raids was in the hands of Captain Dollar who has been a member of the State Police since 1938 and has been associated with gambling investigations since 1946. An affidavit by him described customary bookmaking and lottery operations and stressed the recognized place that the telephone occupies in them. He noted that the illegal activities at Neptune and Midway were "typical gambling operations" which were "dependent upon the use of the telephone for their success" and he referred particularly to the illegally interconnected telephones at Neptune and to the fact that the investigation had revealed that a considerable portion of the lottery business at Midway "was conducted at a table in the rear room where the telephone was located." Under date of October 4, 1966 Captain Dollar addressed a letter to the New Jersey Bell Telephone Company advising, *inter alia,* that the telephones at Neptune and Midway were used in connection with gambling operations and requesting their discontinuance. Thereafter the company complied with the request. See *N. J. S.* 2A:146–3; *P. U. C. Reg.* 14:403–5a.

After their telephone service was disconnected, the plaintiffs filed a complaint in the Chancery Division alleging that the company was under a general obligation "to serve the public without arbitrary discrimination," that it had discontinued service to the plaintiffs without just cause and at the insistence of the Attorney General, and that each plaintiff was engaged "at a lawful occupation" and would suffer irreparable harm if his telephone service remained disconnected. The complaint demanded that the company restore service and that the Attorney General be enjoined from requesting severance of the service. Nothing at all was said in the complaint about the gambling operations at the plaintiffs' premises.

An order to show cause was issued and answering affidavits were filed on behalf of the Telephone Company and the Attorney General. On the return date the parties agreed to dismiss the company on the representation that it would comply with any order issued by the Attorney General pursuant to the court's direction. After considering the briefs and affidavits, the Chancery Division filed an opinion granting injunctive relief pending final hearing. In the course thereof it recognized that telephone service could properly be discontinued where it was being used in connection with illegal operations (*Paterson Publishing Co. v. New Jersey Bell Telephone Co.*, 21 *N. J.* 460 (1956)) but it took the position that there was "no evidence" before it establishing that the telephones in question had been or would be used illegally.

On his appeal, the Attorney General attacks the Chancery Division's view that there was "mere suspicion" rather than "evidence" before it. We consider his attack to be well founded. Unless we are to close our eyes to modern day realities we may fairly infer from the record that the telephones were essentials of the gambling enterprises at both Neptune and Midway. The illegal telephonic interconnection at Neptune, the arrangement of the telephone and other properties at Midway, and the matters set forth in Captain

Dollar's affidavit, much of which could in any event be judicially noticed, furnished adequate basis for the belief that the telephones in Neptune and Midway were part of the bookmaking and lottery setups. It must be borne in mind that the proceeding here is civil rather than criminal in nature and that the Attorney General's burden is met by a lesser presentation than a showing beyond reasonable doubt. See *Paterson Publishing Co. v. New Jersey Bell Telephone Co., supra,* 21 *N. J.,* at *pp.* 465–467; *Telephone News System, Inc. v. Illinois Bell Telephone Co.,* 220 *F. Supp.* 621, 632 (*N. D. Ill.* 1963), affirmed, 376 *U. S.* 782, 84 *S. Ct.* 1134, 12 *L. Ed. 2d* 83 (1964); *Kelly v. Illinois Bell Telephone Co.,* 210 *F. Supp.* 456, 464 (*N. D. Ill.* 1962), affirmed, 325 *F. 2d* 148 (7 *Cir.* 1963); *Taglianetti v. New England Tel. & Tel. Co.,* 81 *R. I.* 351, 103 *A. 2d* 67, 70 (1954); *Andrews v. Chesapeake & Potomac Telephone Co.,* 83 *F. Supp.* 966, 968 (*D. D. C.* 1949).

In *Paterson Publishing Co. v. New Jersey Bell Telephone Co., supra,* 21 *N. J.* 460, the county prosecutor notified the Telephone Company that its services were being used by the Paterson Publishing Company in connection with bookmaking. Thereupon the Telephone Company gave notice that it was discontinuing service and the Publishing Company immediately applied for relief in the Chancery Division. Its application was denied and this was sustained by a unanimous opinion in this Court. In the course of that opinion we held that where a telephone company "knows or has sufficient reason to know that its services are being used in aid of bookmaking it has the right (and indeed the duty) to discontinue them." 21 *N. J.,* at *pp.* 465–466. See *State v. Western Union Telegraph Co.,* 12 *N. J.* 468, 481–482, appeal dismissed, 346 *U. S.* 869, 74 *S. Ct.* 124, 98 *L. Ed.* 379 (1953); *Howard Sports Daily v. Weller,* 179 *Md.* 355, 18 *A. 2d* 210 (1941); *Tracy v. Southern Bell Telephone & Telegraph Co.,* 37 *F. Supp.* 829 (*S. D. Fla.* 1940); 40 *J. Crim. L. & Crimin.* 176, 178–81 (1949).

The Telephone Company's tariff on file with the Board of Public Utility Commissioners provides that services may without notice be suspended or discontinued "if they are or would be used in violation of law" or upon objection to their continuance "made by or on behalf of any governmental authority." The Board's regulations provide that the utility shall "upon reasonable notice, when it can be reasonably given" have the right to suspend or discontinue service in order to comply with a "governmental order or directive" or because of the customer's failure to comply "with any reasonable standard terms and conditions contained in the utility's tariff." *P. U. C. Reg.* 14:403–5a; see *R. S.* 48:2–24. It may be noted that in the *Paterson Publishing Co.* case, *supra,* 21 *N. J.* 460, the company gave notice of a future date of proposed discontinuance thereby affording reasonable and timely opportunity to the subscriber to take any legal steps it considered advisable; normally such action would be feasible[1] and would be likely to avoid the suggestion of procedural infirmity or lack of due process. See Kaufman, *Ex Parte Deprivation of Telephone Service to Alleged Gamblers—Police vs. Constitution,* 2 Clev.-Mar. L. Rev. 9 (1953); *cf. Sokol v. Public Utilities Commission,* 65 *Cal.* 2d 247, 53 *Cal. Rptr.* 673, 418 *P.* 2d 265 (1966); 67 Colum. L. Rev. 773 (1967); 55 Calif. L. Rev. 566 (1967); 20 Stan. L. Rev. 136 (1967). See also *Taglianetti v. New England Tel. & Tel. Co., supra,* 103 *A.* 2d at 71–72; *Pike v. Southern Bell Telephone and Telegraph Co.,* 263 *Ala.* 59, 81 *So.* 2d 254, 266 (1955); 34 Texas L. Rev. 935 (1956); 8 Ala. L. Rev. 344 (1956).

In *Sokol v. Public Utilities Commission, supra,* 65 *Cal.* 2d 247, 53 *Cal. Rptr.* 673, 418 *P.* 2d 265, the plaintiff sought review of a rule or order of the California Public Utilities Commission which directed that the utility summarily dis-

---

[1] This of course does not refer to any instance where a raid is made pursuant to a warrant and the telephone is physically seized or immediately disconnected. *See infra* n. 2.

continue service when advised by a law enforcement agency that the service was being used for unlawful purposes. The plaintiff operated a club which lawfully supplied its members with horse racing predictions. The local chief of police, by letter, advised the telephone company that he had reasonable cause to believe that the plaintiff's telephones were actually being used in connection with illegal bookmaking. He requested that the service be discontinued in accordance with the commission's rule. Thereupon it was discontinued and the plaintiff instituted an action in which he sought a declaration that the commission's rule was unconstitutional in that it deprived him of property without due process of law.

The California Supreme Court struck the rule in an opinion which stressed the fact that no notice or hearing or other procedural safeguard preceded the discontinuance of the service. The court acknowledged that, in certain situations, administrative action may summarily be taken so long as there is effective provision for administrative or judicial review. 53 *Cal. Rptr.,* at *p.* 677, 418 *P. 2d,* at 269; *Ewing v. Mytinger & Casselberry,* 339 *U. S.* 594, 599, 70 *S. Ct.* 870, 94 *L. Ed.* 1088, 1093–1094 (1950); *Horsman Dolls, Inc. v. Unemployment, etc. of New Jersey,* 7 *N. J.* 541, 550–51, appeal dismissed, 342 *U. S.* 890, 72 *S. Ct.* 201, 96 *L. Ed.* 667 (1951); *cf. Bechler v. Parselian,* 36 *N. J.* 242, 256–257 (1961); 1 *Davis, Administrative Law Treatise* § 7.10, *p.* 448 (1958); 1 *Cooper, State Administrative Law, pp.* 139, 143 (1965). But, on balance, it determined that telephone service was much too valuable a right to be terminated summarily on the basis of an ex parte communication from a police officer without any accompanying safeguards whatever. Although it held the commission's rule to be violative of due process, it proceeded to indicate the type of safeguards it would view as minimally sufficient in lieu of prior notice and opportunity for hearing. 53 *Cal. Rptr.,* at *pp.* 678–79, 418 *P. 2d,* at *pp.* 270–71.

The court noted that if the police had desired to search the plaintiff's premises or seize his property they would have been obliged to satisfy a magistrate that there was probable cause for the proposed action. 53 *Cal. Rptr.,* at *p.* 678, 418 *P. 2d,* at *p.* 270; *State v. Macri,* 39 *N. J.* 250 (1963). It saw no reason why the police should not have been under a comparable obligation when they, in effect, sought the practical equivalent of physical seizure of the telephones through discontinuance of service. It outlined its thoughts with respect to future proceedings in the following fashion:

> However, whatever new procedure is hereafter devised must at a minimum require that the police obtain prior authorization to secure the termination of service by satisfying an impartial tribunal that they have probable cause to act, in a manner reasonably comparable to a proceeding before a magistrate to obtain a search warrant. In addition, after service is terminated the subscriber must be promptly afforded the opportunity to challenge the allegations of the police and to secure restoration of the service. A procedure incorporating these measures would provide substantial protection to the subscriber without hindering the enforcement of gambling laws. 53 *Cal. Rptr.,* at *p.* 679, 418 *P. 2d,* at *p.* 271.

In the case at hand the enforcement authorities satisfied the suggested safeguards in *Sokol.* They sought and obtained search warrants on presentations of probable cause. The warrants authorized them to seize all property at the plaintiffs' premises used in connection with bookmaking and lottery. If property was seized illegally, the plaintiffs had a simple and effective mode of obtaining its return pursuant to our rules relating to search warrants. *R. R.* 3:2A–1 *et seq.* Under the statutes, the authorities could have physically seized the telephones along with other property seized by them. See *N. J. S.* 2A:152–6. They chose the alternative of having the service discontinued, apparently in order to avoid doing unnecessary harm to the Telephone Company's equipment.

If the telephones had been physically seized, the plaintiffs presumably would have sought review of that ac-

tion by motion in the Law Division pursuant to the cited rules. *R. R.* 3:2A–6. We incline to the belief that when the service was discontinued following the seizures at their premises, they could have sought similar review in the Law Division. Instead they sought and obtained review and relief in the Chancery Division. Be that as it may, they suffered no legal prejudice by virtue of the fact that the authorities followed the course of discontinuance rather than physical seizure, or the fact that review was sought in the Chancery Division rather than the Law Division. The plaintiffs received the protections incident to prior search warrants and later judicial review. On the showing before us they have no just or reasonable basis for complaining about the discontinuance of the service. At some later date they may of course apply for reinstatement, and if it then satisfactorily appears that the service will not be used for unlawful purposes, they presumably will receive favorable action. See *P. U. C. Reg.* 14:403–5b; *R. S.* 48:2–24; *cf. Dees Cigarette & Auto. M. Co. v. New York Tel. Co.,* 184 *Misc.* 269, 53 *N. Y. S. 2d* 651 (*Sup. Ct.* 1945); *Cyprus v. New York Telephone Co.,* 192 *Misc.* 671, 84 *N. Y. S. 2d* 114 (*Sup. Ct.* 1948), *reversed on other grounds,* 275 *App. Div.* 949, 89 *N. Y. S. 2d* 616 (1949).

In the light of all of the foregoing, little remains to be said with respect to the points advanced in the plaintiffs' brief. In their first point they contend that the Attorney General "had no authority" to request or direct the discontinuance of the service. The powers of the State Police in the prevention and detection of crime have been broadly set forth by the Legislature. See *R. S.* 53:2–1. These powers may also be exercised by the Attorney General whose interest in the proper enforcement of the criminal laws throughout the State is entirely clear. See *R. S.* 52:17B–28; Ferguson, *Formulation of Enforcement Policy: An Anatomy of the Prosecutor's Discretion Prior to Accusation,* 11 Rutgers L. Rev. 507, 521 (1957). Where, as here, the State Police and the Attorney General obtained evidence indicating

that the telephones were being used in connection with book-making and lottery operations, they clearly had the right to seize the telephones in the course of the raids, or alternatively to arrange for the discontinuance of service. In choosing the latter course, they acted well within precedents here and elsewhere. *Cf. McBride v. Western Union Tel. Co.*, 171 *F. 2d* 1, 3 (9 *Cir.* 1949) ; *Dade County N. D. S. Co. v. Florida Railroad & P. U. Comm.*, 48 *So. 2d* 89, 90–91 (*Fla.* 1950) ; see *Paterson Publishing Co. v. New Jersey Bell Telephone Co.*, *supra*, 21 *N. J.*, at *p.* 462.

■■ The plaintiffs' second point asserts that the procedure followed by the Attorney General deprived them of their property without due process of law. Due process is a variable concept which depends on the particular subject matter and circumstances. *Moyer v. Peabody*, 212 *U. S.* 78, 84, 29 *S. Ct.* 235, 53 *L. Ed.* 410, 416 (1909). As we have already pointed out, the plaintiffs had the protections incident to prior search warrants and later judicial review. If the telephones had been seized at the time of the raids, presumably there would have been no basis for any due process complaint. It is true that here the service was not discontinued immediately[2] and that, during the intervening period, notice of the proposed discontinuance might fairly and, without any significantly adverse enforcement effects, have been given as in *Paterson Publishing Co. v. New Jersey Bell Telephone Co., supra*, 21 *N. J.* 460. See also 18 *U. S. C. A.* § 1084 (d). But considering the entire situation, we are not prepared to say that the failure to give such notice amounted to lack of due process. In any event, the plaintiffs were not prejudiced by the fact that the authori-

---

[2] When the service is discontinued immediately there is no more occasion for prior notice than when the telephone is physically seized during the raid ; a contrary approach would disserve law enforcement by affording time to the illicit operator to make new arrangements and so advise customers who call before word of the raid is circulated. See *Sokol v. Public Utilities Commission, supra*, 53 *Cal. Rptr.*, at *p.* 678, 418 *P. 2d*, at *p.* 270.

ties proceeded without notice on the alternative course rather than by physical seizure of the telephones at the time of the raids.

■ The remaining points in the plaintiffs' brief assert that the Attorney General failed to demonstrate that the telephones "were used in connection with unlawful activities" and that the trial judge "properly exercised his discretion in granting interim relief." As stated earlier in this opinion, the materials before the trial court furnished adequate basis for the belief that the telephones in Neptune and Midway were part of the bookmaking and lottery setups. The absence of more direct evidence was not at all fatal and it is worthy of note that even the plaintiffs' affidavits attached to the complaint at the trial level did not contain any denials of the past bookmaking and lottery operations or the earlier use of the telephones in connection with them. All they said was that the telephones "are not being used" for illegal purposes or in connection with illegal activities. These statements spoke in present terms and carried little weight. It is evident to us that, on the entire record before the trial court, the plaintiffs' application should have been denied and that the grant of preliminary injunctive relief was beyond discretionary bounds. *Cf. General Electric Co. v. Gem Vacuum Stores*, 36 *N. J. Super.*, 234, 236 (*App. Div.* 1955).

Reversed.

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, HALL, SCHETTINO and HANEMAN—6.

*For affirmance* — None.