228 N.J. Super. 40 (1988)
548 A.2d 1142
SALLY FRANK, COMPLAINANT-RESPONDENT,
v.
IVY CLUB AND TIGER INN, RESPONDENTS-APPELLANTS. and TRUSTEES OF PRINCETON UNIVERSITY, RESPONDENT, AND UNIVERSITY COTTAGE CLUB, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued February 1, 1988.
Decided October 4, 1988.
*42 Before Judges J.H. COLEMAN, HAVEY and STERN.
*43 Barbara Strapp Nelson argued the cause for appellant Ivy Club (McCarthy & Schatzman, attorneys; Barbara Strapp Nelson on the brief).
Russel H. Beatie, Jr., argued the cause for appellant Tiger Inn (Russel H. Beatie, Jr., and Lum, Hoens, Abeles, Conant & Danzis, attorneys, Russel H. Beatie, Jr., Wayne J. Positan and Susan A. Winston, of counsel, Russel H. Beatie, Jr. and Wayne J. Positan on the brief).
Alexander P. Waugh, Jr., argued the cause for respondent, Trustees of Princeton University (Smith, Stratton, Wise, Heher & Brennan, attorneys, Nicholas deB. Katzenbach of the firm of Riker, Danzig, Scherer, Hyland & Perretti and Thomas H. Wright, Jr., General Counsel, Princeton University, of counsel; Alexander P. Waugh, Jr. on the brief).
Susan Reisner, Deputy Attorney General, argued the cause for respondent Division on Civil Rights (W. Cary Edwards, Attorney General of New Jersey, attorney, Andrea M. Silkowitz, Assistant Attorney General, of counsel; Susan Reisner on the brief).
Sally Frank, respondent, argued the cause pro se and Nadine Taub, argued the cause for respondent Sally Frank, and on behalf of the American Civil Liberties Union of New Jersey (Rutgers University Women's Rights Clinic, attorney, Sally Frank, Nadine Taub and P. Kay McGahen on the brief).
The opinion of the court was delivered by COLEMAN, J.H., P.J.A.D.
The crucial issue raised in these sex based discrimination appeals is whether the Division on Civil Rights (Division) followed the appropriate procedure before concluding that eating clubs located on Prospect Avenue, in Princeton, New Jersey, are subject to the public accommodations provision of New Jersey Law Against Discrimination (N.J.S.A. 10:5-12f). We conclude it did not. We therefore reverse in part and remand for new proceedings.

*44 BACKGROUND
The following background is essential to an understanding of the case. Princeton University (Princeton), located in Princeton, New Jersey, is a private, nonsectarian institution of higher education, founded in 1746. Princeton admitted only male students as undergraduates until 1969. Upperclassmen social life on Princeton's campus revolve around thirteen eating clubs which Princeton depends on to feed a large percentage of its upperclass students. Ivy Club, University Cottage Club and The Tiger Inn are among the thirteen. This case involves complainant's attempt to join one of these all male eating clubs.
Between 1803 and 1843 Princeton required all of its undergraduate students to eat at the University Commons. Beginning in 1843, however, students were permitted to eat off campus. Princeton's eating facility burned down in 1856. After the fire, all of the students ate their meals in boarding houses not affiliated with Princeton until 1906-1907 when Princeton reestablished eating commons for freshman and sophomores. Beginning in the mid-1800's several groups of Princeton students formed "select associations" to provide off campus boarding and lodging. The associations were careful not to become secret societies, which were not permitted at Princeton. The Ivy Club, The University Cottage Club and The Tiger Inn were established as associations which became permanent clubs.
The clubs offer social, recreational and dining activities to Princeton undergraduates. Eight of the thirteen clubs are nonselective, choosing their members by a lottery if demand is too great to accommodate everyone. All of the nonselective clubs are coeducational. Five clubs are selective, choosing their members through a system of interviews known as "bicker." Ivy, Tiger Inn and The University Cottage Club are selective. When the litigation was commenced, these were the only remaining all male clubs. All three clubs are located off campus on Prospect Avenue in separate buildings which they own. *45 They were chartered between 1883 and 1892 pursuant to "an Act to Incorporate Societies or Clubs for Social, Intellectual and Recreative Purposes." L. 1878, c. CXI, p. 175. The clubs are neither owned nor operated by Princeton.
Sally Frank (Frank) enrolled as an undergraduate at Princeton in the fall of 1976. During her junior and senior years (1978-1979 respectively) she attempted to join one of the three all male clubs. Although Frank dined at the Tiger Inn and Ivy Club on a number of occasions, neither of the three all male clubs offered her membership. Frank graduated in 1980. Because the issues raised are of substantial public importance, we concluded in a prior appeal (on August 1, 1983) that despite her graduation, the issues should be resolved. See Busik v. Levine, 63 N.J. 351, 364 (1973), app. dis. 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973).

PROCEDURAL HISTORY
This case has a tortuously complex and protracted procedural history. The appellate record consists of eight volumes of transcripts consisting of 1,527 pages and over 6,000 pages of documents. Frank filed a complaint with the Division pursuant to N.J.S.A. 10:5-13 alleging unlawful discrimination based on sex by Princeton, Ivy Club, University Cottage Club and Tiger Inn contrary to N.J.S.A. 10:5-12f. In a letter dated June 7, 1979, the Division advised Frank that after reviewing her complaint the Division "has decided that the N.J. Law Against Discrimination exempts the aforesaid clubs because they are distinctly private, as provided for in N.J.S.A. 10:5-5(1). Accordingly, the Division will not process this complaint." The Division also found no probable cause to credit the allegation made against Princeton. A similar complaint against Princeton was filed with the Department of Health, Education and Welfare, The Office for Civil Rights, alleging a violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. The Office for Civil Rights terminated its investigation in April *46 1980 when it concluded the "eating clubs are private social organizations whose membership practices are exempt from the requirements of Title IX." That office dismissed the complaint after finding "no violation of Title IX on the part of Princeton University against Ms. Sally Frank."
After extensive discussions, the Division eventually agreed that it would process a second complaint if filed. On November 26, 1979, Frank filed another complaint with the Division against the same parties. This complaint alleged the clubs were "public accommodations" because they functioned "as arms for Princeton University." A verified complaint was issued by the Division on December 19, 1979. On January 28, 1980, the three clubs filed answers in which they denied they were places of public accommodation affiliated with Princeton University. The clubs also asserted their members' rights to freedom of association under the First Amendment would be violated if the relief sought by Frank were granted. Similarly, Princeton filed an answer denying that it was a place of public accommodation and that it had sanctioned or committed unlawful acts of discrimination.
The Division conducted a preliminary investigation pursuant to N.J.S.A. 10:5-14 to determine whether it had jurisdiction and whether "probable cause exists for crediting the allegations of the complaint...." Without conducting any type of a hearing or holding a fact-finding conference (see N.J.A.C. 13:4-2.3), the Division dismissed the second complaint on December 9, 1981. Frank was not afforded any opportunity to participate in the investigation. The Division made no findings of fact. The Division concluded "the Clubs are by their nature distinctly private and as such these responding Clubs are excluded from the jurisdiction of the Division on Civil Rights pursuant to N.J.S.A. 10:5-5(1)." The Division also found no probable cause to support the allegations against Princeton.
Frank filed a notice of appeal from the dismissal of the second complaint. On August 1, 1983 a different part of this *47 court issued its decision. Without reaching the merits of the issues raised by the complaint, we reversed the dismissal of the complaint on procedural grounds: the lack of findings of fact and the lack of a hearing. We concluded that a hearing and factual findings were essential requirements before determining whether the Division has jurisdiction because "a denial of jurisdiction is as significant to a complainant as would be the ultimate determination regarding discrimination." We reversed the dismissal of the complaint and remanded the case to the Division to conduct "a more formal inquiry as to the factual issues as they relate to jurisdiction of the Division," probable cause and the substantive issues presented. The Division was directed to make adequate findings of fact and conclusions of law.
Before resuming its investigation pursuant to our mandate, the Division filed a motion on August 11, 1983 for reconsideration of our decision. The purpose of the motion was to seek clarification as to the kind of hearing required by our decision. The motion was denied on September 6, 1983 without further directions.
By letter dated October 5, 1983 the Division notified the parties that a fact-finding conference would be held pursuant to N.J.A.C. 13:4-2.3 "to make a preliminary determination as to whether there are material facts in dispute. In the event that there exists genuine issues of material fact, the Division will conduct a public hearing to resolve the disputed issues."
The parties were directed to meet with the Division's Chief of the Enforcement Bureau, James Sincaglia (Sincaglia), on November 16, 1983. The parties were told to be prepared to discuss only the jurisdictional aspects of the case at the fact-finding conference. They were also advised to provide a reiteration of all documentation previously submitted to the Division and "any other materials which you deem relevant and which have not been previously submitted." Interrogatories were exchanged between the parties. On December 19, 1983 *48 the parties were again assured that if the fact-finding conference did not resolve all of the facts, "it would then be appropriate to conduct a plenary hearing. See Cunningham v. Department of Civil Service, 69 N.J. 13, 19-24 (1975)."
On March 12 and April 3, 1984 fact-finding conferences were held by Sincaglia. Frank filed an amended verified complaint on March 12, 1984 in which she made the additional allegations that the clubs individually were public accommodations apart from any relationship with Princeton. The parties denied these new allegations.
On April 18, 1984 the parties were notified by the Division that the record would close on April 30, 1984. The parties were advised to review their files and to submit any additional documentation they desired. The Division granted the parties an extension of the deadline for submitting materials to permit additional information concerning "the number of hat bids[1] extended during the years that Sally Frank was at Princeton as well as the number of persons who bickered and were extended bids in recent years." By letter dated April 30, 1984, counsel for the Ivy Club submitted additional information.
On May 31, 1984, Sincaglia notified the parties of the fact-finder's Rulings and the stipulations accepted. The findings were divided into five categories: (1) stipulations proposed by the complainant and accepted by the respondents; (2) stipulations proposed by the respondents and accepted by the complainant; (3) the Division fact-finder's Ruling on the stipulations that were proposed by the complainant and not accepted by the respondents; (4) the Division fact-finder's ruling on the stipulations that were proposed by the respondents and not accepted by the complainant; and (5) stipulations that would require conclusions that would be made by the Director upon *49 review of the entire record which were not accepted or rejected by the Division's fact-finder.
Following the transfer of the entire record to the Director, the parties were given 45 days "to submit proposed findings of fact and conclusions of law on the entire record."
On May 14, 1985 the Director issued a Finding of Probable Cause. The Director found the Division had jurisdiction over the three eating clubs and that probable cause to believe sex discrimination existed. Three weeks after the Finding of Probable Cause was issued (June 7, 1985), Frank requested the case be transferred to the Office of Administrative Law (OAL) as a contested case. See N.J.S.A. 10:5-13 and N.J.A.C. 13:4-12.1(c) and (d). In compliance with this request, the case was transferred to the OAL on July 18, 1985 or August 20, 1985, the exact date is not made clear by the record.
The case was assigned to an Administrative Law Judge (ALJ) who scheduled a prehearing conference for September 26, 1985 to identify the issues and the nature of the proceeding. A "Prehearing Order" was issued by the ALJ on October 1, 1985. That order provided, among other things, that "Complainant is considering moving for summary judgment on the issue of discrimination and liability. If complainant does make such a motion, it is to be filed and served in accordance with the Uniform Administrative Procedures Rules (N.J.S.A. [sic] [N.J.A.C.] 1:1-1 et seq.) on or before (October 17, 1985)."
October 16, 1985, Frank filed a motion pursuant to N.J.A.C. 1:1-12.5 et seq. for partial summary decision on the issue of jurisdiction. The Ivy Club and Tiger Inn filed briefs in opposition to the motion. On December 12, 1985 the ALJ issued his Initial Decision on Partial Summary Decision. He granted the motion finding that the Director's May 14, 1985 finding that the Division had jurisdiction should be considered final. The ALJ also found there were no material facts in dispute and that the facts which the clubs alleged were disputed were found to be immaterial to the May 14, 1985 decision of the Director. On *50 February 16, 1986, the Director issued an Order of Partial Summary Decision on Jurisdiction which adopted the recommendations of the ALJ.
The University Cottage Club settled with Frank on February 26, 1986. As part of the settlement, women are permitted to seek membership in the club and the club paid Frank $20,000. See Tiger Inn v. Edwards, 636 F. Supp. 787, 789 n. 1 (D.N.J. 1986) (in which Tiger Inn and Ivy Club sought to enjoin the Division from hearing the case). Consequently, The University Cottage Club has not participated in these appeals as the claims against it were dismissed as part of the settlement.
After the ALJ's ruling of December 12, 1985, Frank filed a Motion for Summary Decision against the clubs and Princeton on the issue of liability. The ALJ issued an Initial Decision on June 16, 1986, granting the Motion for Partial Summary Decision. He ruled that liability existed with regard to the two clubs, but not against Princeton, stating that more information was necessary to address the issue of what constituted "aiding and abetting" discrimination by Princeton.
On July 26, 1986, Frank and Princeton entered into a Stipulation and Order of Partial Settlement. Princeton continued to participate in the proceedings because of the potential involvement it would have in whatever remedies were ultimately ordered by the Division.
On July 28, 1986, the Director adopted the ALJ's Initial Decision of Partial Summary Decision on liability respecting the two clubs. The Director found the claims against Princeton were moot based on the settlement agreement between Frank and Princeton. There has been no appeal from that determination. The Order remanded the matter back to the OAL for further proceedings on remedies to be afforded Frank. Following that remand, the ALJ conducted hearings for six days between July 29 and August 6, 1986, during which sworn testimony subject to cross-examination and additional documents were admitted as evidence.
*51 On January 29, 1987, the ALJ issued his Initial Decision on the issues of damages and remedies. In his decision, he afforded the following remedies:
(a) that Ms. Frank be awarded $2,500 in compensatory damages by the two Clubs;
(b) that Ms. Frank not be awarded membership in either club;
(c) that the two Clubs should sever certain ties to Princeton in order to attain `distinctly private' status under N.J.S.A. 10:5-5(l);
(d) that Princeton should avoid reference to the two Clubs as being affiliated or connected with the University in all future publications.
On May 26, 1987, the Director issued the Final Administrative Decision and Order. The Initial Decision of the ALJ was adopted in part and modified in part: (a) the compensatory damages were increased to $5,000; (b) the two Clubs were ordered to admit women, but not Frank, and (c) the two Clubs were not permitted to sever ties with Princeton.
The Ivy Club filed an appeal on July 10, 1987 and was assigned Docket No. A-5304-86T5. The Tiger Inn filed its appeal on the same day and was assigned Docket No. A-6058-86T5. The Director granted a stay of her final decision directing the Clubs to admit women. The damages awarded have been paid and are held in escrow by the Division. The appeals have been consolidated.

OBJECTIVE OF LAW AGAINST DISCRIMINATION
Eradication of the "cancer of discrimination" has long been one of this State's highest priorities. Fuchilla v. Layman, 109 N.J. 319, 334 (1988), cert. denied, sub nom., University of Medicine and Dentistry of N.J. v. Fuchilla, ___ U.S. ___, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). Discrimination based on sex "is peculiarly repugnant in a society which prides itself on judging each individual by his or her merits." Peper v. Princeton University Board of Trustees, 77 N.J. 55, 80 (1978). Generally, it has been recognized that the Division has expertise "in recognizing acts of unlawful discrimination, no matter how subtle they may be." Clowes v. Terminix Intern., Inc., 109 N.J. 575, 588 (1988).
*52 N.J.S.A. 10:5-4 declares as a civil right the opportunity of all persons to obtain and enjoy all the rights and privileges of a "public accommodation." Princeton is a public accommodation within the meaning of the Law Against Discrimination. N.J.S.A. 10:5-5(1); N.J.S.A. 10:5-12f; Dixon v. Rutgers, the State University of N.J., 110 N.J. 432, 452 (1988); Peper, supra, 77 N.J. at 67. The ban against invidious discrimination by a public accommodation relates to a facility used by or maintained for the use of the general public. Ibid.
Despite Ivy's and the Tiger Inn's contentions otherwise, there is a developing body of law holding that the Law Against Discrimination also covers private establishments which have altered their distinctly private character through close association with a public accommodation. See Clover Hill Swimming Club v. Goldsboro, 47 N.J. 25 (1966); Hebard v. Basking Ridge Fire Company No. 1, 164 N.J. Super. 77 (App.Div. 1978), app. dis. 81 N.J. 294 (1979); Nat. Org. for Women v. Little League Baseball, 127 N.J. Super. 522 (App.Div. 1974), aff'd 67 N.J. 320 (1974). See also Bob Jones University v. Johnson, 396 F. Supp. 597, 602-604 (S.C. 1974); Pinkney v. Mallory, 241 F. Supp. 943 (N.D.Fla. 1965).
Princeton as a public accommodation for higher education performs a significant social function by promoting "the pursuit of truth, the discovery of new knowledge through scholarship and research, the teaching and general development of students, and the transmission of knowledge and learning to society at large." State v. Schmid, 84 N.J. 535, 564 (1980), app.dis. 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982) (quoting from Princeton University Regulations passed by the Council of the Princeton University Community, May 1975, as amended 1976). Hence, it is important to eradicate sex discrimination at Princeton and private establishments associated with Princeton which have altered their distinctly private character through close association with the University. In the process, a balance must be struck between the club members' associational *53 rights, and the State's compelling interest in eliminating invidious sex discrimination. See New York State Club Assoc. v. New York City, 487 U.S. ___, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988); Board of Directors of Rotary Int'l v. Rotary Club, 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987). We hasten to add that this decision does not address the relative merits of the allegation of sex discrimination.

ADEQUACY OF HEARING
In its appeal, Ivy contends "the Division denied Ivy the [plenary] hearing to which it was entitled pursuant to the Appellate remand, State law and general principles of due process and fair play." It argues that as a party to a contested case, it was entitled to a hearing before an ALJ on the issue of jurisdiction once the matter became a contested case. It argues further that the fact-finding conference should have been conducted by the Director, not her designee.
The Tiger Inn argues it "was not given the hearing ordered by this Court and required by law." This argument is based on its assertion that the "Appellate Division ordered the Division on Civil Rights to conduct a plenary hearing." It also contends that a plenary hearing was required by the Administrative Procedure Act, N.J.S.A. 52:14B-9(c), and that witnesses who testified were required by N.J.S.A. 10:5-16 to be under oath. Finally, it argues that "disputed issues were to be resolved at a hearing but were not" and that this denied it procedural due process. In essence, the clubs argue they were entitled to an evidentiary hearing under the Administrative Procedure Act and based on principles of fair play and administrative due process.
Princeton takes no position on the issues of jurisdiction, the adequacy of the hearings or the liability of the clubs. The Division contends no plenary hearing was required because no material facts were in dispute. Frank takes the position that *54 the method used by the Director to decide the issue of jurisdiction and liability was appropriate.
The procedural requirement of due process necessarily varies from case to case. Lopez v. N.J. Bell Telephone Co., 51 N.J. 362, 373 (1951); Avant Industries Ltd. v. Kelly, 127 N.J. Super. 550, 553 (App.Div. 1974). The precise requirements in a given case depend on the interest of the parties under the controlling circumstances. Morrisey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); Matter of Kimber Petroleum Corp., 110 N.J. 69, 100 (1988) (Wilentz, C.J. dissenting). In a contested case involving disputed facts, however, an evidentiary hearing and findings of fact are mandated by both N.J.S.A. 52:14B-9 and administrative due process. Bally Mfg. Corp. v. N.J. Casino Control Comm'n, 85 N.J. 325, 333 (1981), app.dis. 454 U.S. 804, 102 S.Ct. 77, 70 L.Ed.2d 74 (1981); Cunningham v. Dept. of Civil Service, 69 N.J. 13, 24-25 (1975). The Court in Bally defined an evidentiary hearing as a trial-type hearing which is required "where the proposed administrative action is based on disputed adjudicatory facts." Bally, supra, 85 N.J. at 334. It is not the vital interest of a party involved in an administrative proceeding which triggers the need for an evidentiary hearing. Rather, it is the existence of disputed adjudicative facts which could affect the ultimate decision on the merits. Adjudicative facts are those which answer the questions who did what, where, when, how, why, with what motive or intent. 2 Davis, Administrative Law Treatise, § 12:1 at 406; § 12:2 at 409-410 and § 12:3 at 413 (2d ed. 1979).
The Law Against Discrimination is silent as to the precise procedure to be employed to determine probable cause required by N.J.S.A. 10:5-14. The regulations promulgated for the Division (N.J.A.C. 13:4-1.1 et seq.), however, state they shall govern all proceedings in the Division. Generally, the head of an agency has the sole power to decide how best to proceed in a given case, depending upon the nature of the claim presented. In re Uniform Adm'n Procedure Rules, 90 N.J. 85, 104 (1982).
*55 We reject appellants' contention that before the case was transferred to the OAL they had a right to a hearing before an ALJ to determine the threshold question of probable cause required by N.J.S.A. 10:5-14. The OAL conducts hearings in contested cases, N.J.S.A. 52:14B-9(c), and only then upon request. The head of an agency has the right not to transfer a contested case to the OAL. The agency head has the discretionary authority to both hear the contested matter and to render a determination. In re Uniform Adm'n Procedure Rules, supra, 90 N.J. at 90-91, 104 n. 8 (1982); Unemployed-Employed Council of N.J., Inc. v. Horn, 85 N.J. 646, 654 (1980). See also N.J.S.A. 52:14F-8(b). But when the agency head decides to both hear the case and render an adjudication on the merits, the agency head must personally and directly conduct the hearing and render the decision. Unemployed-Employed Council of N.J. Inc. v. Horn, supra, 85 N.J. at 657-658; N.J.S.A. 52:14F-8(b). As part of a culling-out process, the agency head is permitted by N.J.S.A. 52:14F-7 to first determine whether the case is contested and, "if so, whether the case should be sent to the OAL for an adjudicatory hearing to be conducted by an administrative law judge." In re Uniform Adm'n Procedure Rules, supra, 90 N.J. at 105.
We also reject Ivy's contention that the fact-finding conference should have been conducted by the Director and not by Sincaglia. Sincaglia was Chief of the Enforcement Bureau. N.J.A.C. 13:4-1.4 states a Bureau Chief "shall exercise such powers of the Division as the Director may from time to time delegate to him or her." Sincaglia was designated by the Director to conduct the fact-finding conference which was proper for the investigative phase of the case. He could not, however, conduct an adjudicatory hearing without violating N.J.S.A. 52:14F-8(b).
Even though the head of the Division is empowered to decide both probable cause and the ultimate merits (final adjudication), they involve distinctly different determinations and different *56 rules apply. The probable cause determination implicates the administrative mechanisms employed to investigate the complaint as mandated by N.J.S.A. 10:5-14. This investigation is a culling-out process whereby the Legislature directed the Division to make an initial determination of whether probable cause exists to believe a complainant has been discriminated against in violation of N.J.S.A. 10:5-1 et seq.
The Law Against Discrimination does not define probable cause. But we have heretofore defined it to mean a "reasonable ground of suspicion supported by facts and circumstances strong enough in themselves to warrant a cautious man in the belief that the law is being violated." Sprague v. Glassboro State College, 161 N.J. Super. 218, 225 (App.Div. 1978) (quoting People v. Marshall, 13 N.Y.2d 28, 34, 241 N.Y.S.2d 417, 421, 191 N.E.2d 798, 801 (Ct.App. 1963)).
Much the same way as in the administration of criminal justice (see R. 3:4-3 and probable cause for Fourth Amendment purposes, State v. Novembrino, 105 N.J. 95, 105-122 (1987)) a proceeding to determine the existence of probable cause is not an adjudication on the merits. Rather, it is an initial threshold procedure to determine whether the matter should be brought to a halt or proceed to the next step on the road to an adjudication on the merits. The quantum of evidence required to establish probable cause is less than that required by a complainant in order to prevail on the merits. As the name implies, probable cause is concerned with probabilities. When deciding probable cause, the Director was not permitted to resolve disputed facts. The Director was not concerned with whether the information collected during the investigation was true or false  only whether it was reasonable to accept it as true and if so whether it justified consideration on the merits. A common sense, practical and nontechnical standard is required for the probable cause determination.
Following our August 1, 1983 remand decision, the Division undertook to test its jurisdiction and probable cause required by *57 N.J.S.A. 10:5-14 by employing the fact-finding conference method outlined in N.J.A.C. 13:4-2.3. This regulation in pertinent part provides:
(a) Fact-finding, as part of an investigation in a discrimination complaint, is subject to the following:
1. As part of its investigation, the Division may convene a fact-finding conference for the purpose of obtaining evidence, identifying the issues in dispute, ascertaining the positions of the parties and exploring the possibility of settlements. The fact-finding conference is not an adjudication of the merits of the complaint.

2. The Division shall provide the parties with written notice of the conference. Said notice shall identify the individuals requested to attend on behalf of each party, and any documents which any party is requested to provide within the specified time frame.
(b) The conference shall be conducted as follows:
1. The Division employee acting as fact-finder shall conduct and control the proceedings.
2. Upon prior notice to the Division, the parties may bring witnesses to the conference in addition to those whose attendance may be specifically requested by the Division, but the fact-finder shall have discretion over which witnesses shall be heard and the order in which they are heard. The fact-finder may exclude any witness or other person from the conference not limited to those who are not giving evidence, except that one representative of each party and counsel shall be permitted to remain throughout.
3. The Division may request the parties to provide affidavits from witnesses who appear at the fact-finding conference.
4. A party may be accompanied at a fact-finding conference by his/her attorney or another representative, and by a translator, if necessary.
5. An attorney for a party who has not previously entered his or her appearance shall do so at the outset of the conference.
6. Because the fact-finding conference is a means of investigation and not a hearing on the merits of a case, the parties shall not be entitled to cross-examine witnesses. All questioning shall be conducted by the fact-finder, unless in his or her discretion the fact-finder permits questions to be asked by other persons present at the conference.
7. During the conference, the fact-finder may allow a recess to permit the parties to discuss settlement.
(c) A record of the fact-finder conference shall be discovered as follows:
1. Following a Finding of Probable Cause or No Probable Cause, any reports of factual statements made at the fact-finding conference shall be discoverable by the parties.
2. Any records made of settlement discussions during the conference shall not be discoverable. [Emphasis added].
*58 The Director never intended to equate the fact-finding conference to an adjudicatory hearing. She said as much in the Division's motion for a clarification of our August 1, 1983 decision when she advised the court and counsel that the fact-finding conference was part of the Division's initial investigation and if material facts were disputed "it would be appropriate to hold a plenary contested case hearing to determine jurisdiction." Also, in the Director's October 5, 1983 letter to counsel for the parties, she made clear that the purpose of the fact-finding conference was "to make a preliminary determination as to whether there are material facts in dispute." The parties were assured that if material facts were disputed, "the Division will conduct a public hearing to resolve the disputed issues."
Furthermore, in a letter dated October 26, 1983 and addressed to Frank, the Director stated that if the fact-finding conference did not resolve the issue of jurisdiction, "I will again review the matter for possible submission to a hearing." In addition, Sincagalia acknowledged that a plenary hearing would be conducted if material facts were in dispute. On January 3, 1984 Sincaglia advised counsel for the parties:
regarding the exact nature of the Fact Finding Conference please note the following. The Fact Finding Conference is not an adjudication of the merits of the Complaint but a means of investigation.... Frank is not expected to prove the allegations of her Complaint, nor are Respondents required to prepare a defense. Rather, the parties should be prepared to attempt to resolve any remaining disputed facts and to present additional relevant evidence to the Fact Finder.
Notwithstanding these assurances that a hearing would be conducted, Sincaglia submitted his fact-finder's report on May 31, 1984 which contained stipulations and factual findings. He reported 39 stipulations submitted by Frank which the parties accepted as proposed or as modified and revised by the parties. Similarly, 191 of the respondents'-appellants' proposed stipulations were accepted. Eight stipulations proposed by Frank were not accepted by the respondents (Appendix A) and ten stipulations proposed by respondents were not accepted by *59 Frank (Appendix C). Sincaglia made tentative findings of fact respecting these 18 proposed stipulations. He advised counsel for the parties "that sufficient evidence existed in the record to issue Findings on the disputed stipulations. Therefore no material facts remain in dispute."
Each attorney was permitted to respond to Sincaglia's report. After considering suggested revisions and objections to the report in part based on the lack of a hearing, Sincaglia issued the final stipulations the parties accepted and his final rulings on the disputed stipulations of fact. See Appendix B and D. In an undated letter to counsel for the parties, Sincaglia stated:
There was ample documentary evidence and testimony submitted by the parties to enable the Fact Finder to rule on the disputed stipulations of fact. Likewise, a review of the stipulations, rulings and information collected during the investigation indicates that the parties essentially agree on the facts but disagree on their legal significance. Therefore, no material facts remain in dispute, all issues have been investigated as completely as possible and no proof has been presented to conclude otherwise. Thus, there is no need to conduct a hearing in this matter.
All parties have forty-five days from their receipt of this letter to submit proposed findings of fact and conclusions of law on the entire record. Please refer to the record where appropriate. The parties will then have an additional thirty days to submit briefs in reply. At that time the Director will consider all of the evidence, stipulations and proposed findings and she will issue within forty-five days findings of fact and conclusions of law on the issue of jurisdiction. Further proceedings will depend on the outcome of the Director's decision.
After review of the fact-finder's report, the Director made the determination that Princeton is a public accommodation within the meaning of N.J.S.A. 10:5-5(1). The Director also made the determination that the Division has jurisdiction over the Ivy Club and the Tiger Inn because the clubs have significantly altered their purely private character through their close association with Princeton, a public accommodation, thereby depriving the clubs of the exemption for a "bona fide club, ... which is in its nature distinctly private." N.J.S.A. 10:5-5(1). Finally, the Director made the determination that probable cause existed to believe the clubs discriminated against Frank *60 on the basis of sex and that Princeton had aided and abetted in the discrimination.
Following the jurisdictional and probable cause threshold determinations which were made pursuant to N.J.S.A. 10:5-14, the case was transferred to the OAL to conduct a hearing as a contested case. See N.J.S.A. 10:5-13 and N.J.A.C. 13:4-12.1(c) and (d). Frank filed motions for partial summary decision on the issues of jurisdiction and discrimination. The summary decision rule is N.J.A.C. 1:1-12.5, which provides in pertinent part:
(a) At any time after a case is determined to be contested, a party may move for summary decision upon all or any of the substantive issues therein.
(b) The motion for summary decision shall be served with briefs and with or without supporting affidavits. The decision sought may be rendered if the papers and discovery which have been filed, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to prevail as a matter of law. When a motion for summary decision is made and supported, an adverse party in order to prevail must by responding affidavit set forth specific facts showing that there is a genuine issue which can only be determined in an evidentiary proceeding. If the adverse party does not so respond, a summary decision, if appropriate, shall be entered.
The validity of the rule permitting summary decision (formerly N.J.A.C. 1:1-13.1 to 1:1-13.4) was upheld in In re Uniform Adm'n Procedure Rules, supra, 90 N.J. at 106. See also In the Matter of Robros Recycling Corporation, 226 N.J. Super. 343, 350 (App.Div. 1988).
The ALJ issued his Initial Decision for summary decision on the issue of jurisdiction on December 12, 1985. He stated the issue as follows:
The dispute at this posture of the case concerns the weight to be accorded to the Director's determination on jurisdiction. The question arises because neither in the 52 page document entitled "Finding of Probable Cause" nor in the transmittal letter to the Office of Administrative Law did the Director state whether she intended that determination to be final (and therefore binding on OAL) or whether it was merely preliminary (and therefore subject to a de novo hearing).
He concluded the "law of the case doctrine," State v. Hale, 127 N.J. Super. 407, 410-411 (App.Div. 1974), "requires, under the circumstances here, that the Division's jurisdictional ruling be *61 considered final." He also concluded the Director intended for her finding on jurisdiction to be final. The Director adopted the ALJ's Initial Decision and entered an order for partial summary decision on the issue of jurisdiction on February 16, 1986.
The clubs were virtually led, albeit inadvertently, into a trap. It is clear from our August 1, 1983 decision that the remand contemplated a plenary hearing before the Division if material factual issues were disputed. It is also clear that at the conclusion of the fact-finding conference, substantial and material factual disputes existed. The use of the fact-finding conference to decide preliminarily the threshold question of probable cause was not proscribed by our decision. But the fact-finding conference in lieu of a plenary hearing may be employed solely as an investigative technique and not for adjudicatory purposes. Correspondence from the Division to counsel for the parties made this unmistakably clear. Beyond the correspondence, N.J.A.C. 13:4-2.3(a)1 and (b)6, under which the Division operates, state the fact-finding conference is neither "an adjudication of the merits of the complaint," nor even "a hearing on the merits of a case," but merely "a means of investigation."
Once material factual disputes were found to exist at the fact-finding conference, a trial-type hearing was required. Despite assurances that such a hearing would be conducted, Sincaglia resolved the disputed facts. See Appendix A, B, C and D. We find no provision in N.J.A.C. 13:4-2.3 permitting such a resolution. These factual findings were adopted and relied upon by the Director in her decision on probable cause.
Similarly, the Director in her Findings on Probable Cause relied in part on unsworn testimony taken during the fact-finding conferences from Gordon Reed, Manager of The University Cottage Club, Michael O'Malley, Manager of Ivy Club, Shelly Rigger, a 1984 graduate of Princeton, and Gordon R. Harrison, Manager of Tiger Inn and other eating clubs. The use of unsworn testimony in the adjudicatory process clearly contravened *62 N.J.S.A. 10:5-16. The Director also relied on 40 documents not stipulated by either party. This is but another example of deciding material factual disputes without a trial-type hearing.
We are persuaded that the summary decision on jurisdiction must be reversed. In the circumstances of this case, which we have articulated, the clubs have not been afforded administrative due process. This is a hotly contested case. Despite the fact that the parties have stipulated 230 facts, many material factual disputes remain. It was highly improper for Sincaglia or the Director to resolve disputed adjudicative facts without a trial-type hearing. Sincaglia was obligated to determine whether material adjudicative facts existed but not to decide them.
The rule under which the summary decision was based, N.J.A.C. 1:1-12.5, precludes a summary decision if material factual disputes exist in much the same way as R. 4:46-2. See Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 73-75 (1954). Only in a trial-type hearing can disputed adjudicative facts be resolved. Bally Mfg. Corp. v. Casino Control Com'n, supra, 85 N.J. at 334; Cunningham v. Dept. of Civil Service, supra, 69 N.J. at 24-25; N.J.S.A. 52:14B-9. The broad discretion which the Director has in deciding how to proceed in a given case, or when to order a hearing pursuant to N.J.A.C. 13:3-12.1(a), is circumscribed by the requirement of administrative due process, N.J.S.A. 52:14F-8(b) and N.J.S.A. 10:5-16.
In this same connection, we observe that in the circumstances of this case reliance on the law of the case doctrine represents an abuse of discretion. It is well established that application of the law of the case doctrine is discretionary and not mandatory. State v. Reldan, 100 N.J. 187, 205 (1985). Because there was no trial-type hearing to resolve disputed adjudicative facts, the ends of justice were disserved. We therefore reverse the summary decision on jurisdiction.
*63 The ALJ also granted Frank's motion for partial summary decision on liability. In his June 16, 1986 Initial Decision the ALJ concluded that based on the summary decision on jurisdiction, no material factual issues existed. He found that Ivy and the Tiger Inn intentionally exclude women in general from membership. He also found that Ivy and the Tiger Inn had engaged in sex discrimination in violation of N.J.S.A. 10:5-12(f). On July 28, 1986 the Director adopted the ALJ's Initial Decision finding sex discrimination.
Because the procedure and factual determination which undergird the summary decision on liability are so intimately related to the summary decision on jurisdiction, both summary decisions are hereby reversed.
Notwithstanding our reversal of summary decisions on jurisdiction and liability, we are completely satisfied that the Director's threshold finding of probable cause required by N.J.S.A. 10:5-14 is supported by the record. As we noted previously, a trial-type hearing was not required for the investigative inquiry required by N.J.S.A. 10:5-14. Based on the 230 stipulations of the parties, we are satisfied that probable cause has been established to believe that N.J.S.A. 10:5-12(f) has been violated. This is merely a threshold determination and is not dispositive of the merits of the case. The procedural irregularities which require a reversal, had no impact on this threshold determination.
To summarize, we reverse the orders of the Director dated February 6, 1986 and July 28, 1986. It follows from those reversals that the final order dated May 26, 1987 respecting damages and other remedies must be vacated as it is presently without legal foundation. The case is remanded to the Director who is directed to forward the case to the OAL to conduct a trial-type hearing on the issues of (1) whether the clubs fall within the public accommodation section of the Law Against Discrimination; N.J.S.A. 10:5-5(1) and 10:5-12f; (2) whether the clubs engaged in sex discrimination against Frank in violation *64 of N.J.S.A. 10:5-12f; and (3) what remedy should be provided if the law was violated. All of these issues must be adjudicated at a trial-type hearing. Summary decision on either issue is precluded by the existing record. The 230 stipulations shall be introduced at the trial-type hearing without further formal proof. The transcripts of the hearing on remedies and damages may also be used. The parties are permitted to freely supplement the record on all aspects of the hearing. We do not retain jurisdiction.
REVERSED AND REMANDED.

APPENDIX A
B. THE FOLLOWING STIPULATIONS PROPOSED BY COMPLAINANT WERE NOT ACCEPTED BY RESPONDENTS EITHER AS PROPOSED OR REVISED AND REMAIN IN DISPUTE. BASED UPON ALL OF THE MATERIAL EVIDENCE SUBMITTED, THE DIVISION FINDS AS FOLLOWS:
STIPULATION # 3  The Division holds that Princeton University, a private, non-sectarian institution of higher education, is a place of public accommdation as defined by N.J.S.A. 10:5-1, et seq.
STIPULATION # 11  The record herein does not support the proposal that the all-male clubs regularly advertise their parties at other schools. The record does indicate, however, that students from other schools are made aware of and attend functions at the all-male clubs.
STIPULATION # 14  The record herein indicates that Ivy Club, and University Cottage Club sought permission to form from Princeton University. There is no evidence to suggest that Tiger Inn sought such permission. Further, the record does not support the proposal that Princeton University granted the "Clubs" formal permission to organize.
STIPULATION # 15  The record herein demonstrates that after the "clubs" were formed, committees made up of faculty members were appointed by the Princeton University Board of Trustees to monitor the operations of the "clubs". Such practice, however, ceased prior to Complainant's admission to Princeton.
STIPULATION # 16  The record herein demonstrates that faculty members of Princeton University served on "club" committees which selected new members. This practice, however, ceased prior to Complainant's admission to Princeton.
*65 STIPULATION # 17  The record herein demonstrates that the Princeton University Dean of Students' Affairs Office has been involved in setting the dates for the Spring "club" membership selection procedure. This involvement occurred prior to Complainant's admission to Princeton.
STIPULATION # 18  The record herein does not support Complainant's stipulation as proposed. The record does indicate, however, that Princeton University has attempted from time to time to persuade the "clubs" to adjust their dates for Bicker to accommodate the academic calender.
STIPULATION # 19  The record herein indicates that an "Interclub Agreement" exists between the "clubs" and Princeton University which at least in part intends to regulate the behavior of "club" members and their guests on the "clubs'" premises.

APPENDIX B
B. THE FOLLOWING STIPULATIONS PROPOSED BY COMPLAINANT WERE NOT ACCEPTED BY RESPONDENTS EITHER AS PROPOSED OR REVISED AND REMAIN IN DISPUTE. BASED UPON ALL OF THE MATERIAL EVIDENCE SUBMITTED, THE DIVISION FINDS AS FOLLOWS:
# 11  The record herein does not support the proposal that the all-male clubs regularly advertise their parties at other schools. The record does indicate, however, that students from other schools are made aware of and attend functions at the all-male clubs.
# 14  The record herein indicates that Ivy Club, and University Cottage Club sought permission to form from Princeton University. There is no evidence to suggest that Tiger Inn sought such permission. Further, the record does not support the proposal that Princeton University granted the "Clubs" formal permission to organize.
# 15  The record herein demonstrates that after the "clubs" were formed committees made up of faculty members were appointed by the Princeton University Board of Trustees to monitor the operations of the "clubs." Such practice, however, ceased prior to Complainant's admission to Princeton.
# 16  The record herein demonstrates that faculty members of Princeton University served on "club" committees which established Bicker procedures. This practice, however, ceased prior to Complainant's admission to Princeton.
# 17  The record herein demonstrates that the Princeton University Dean of Student Affairs Office has been involved in setting the dates for the Spring "club" membership selection procedure. This involvement occurred prior to Complainant's admission to Princeton University.
# 18  The record herein does not support Complainant's stipulation as proposed. The record does indicate, however, that Princeton University has attempted *66 from time to time to persuade the "clubs" to adjust their dates for Bicker to accomodate the academic calender.
# 19  The record herein indicates that an "Interclub Agreement" exists between the "clubs" and Princeton University which, at least in part, intends to regulate the behavior of "club" members and their guests on the "clubs'" premises. (No executed copy of this "Agreement" has been produced by any party.)
C. THE FOLLOWING STIPULATIONS, IF ACCEPTED, WOULD REQUIRE CONCLUSIONS OF THE KIND THAT WILL BE MADE BY THE DIVISION UPON REVIEW OF THE ENTIRE RECORD TAKEN AS A WHOLE. THEREFORE, THEY HAVE NOT BEEN ACCEPTED OR REJECTED AT THIS TIME.
# 6  Ivy Club, Tiger Inn, and the University Cottage Club (hereinafter the "all-male clubs") are an integral part of Princeton University.
# 30  The opportunity to join an eating club is one of the advantages in attending Princeton.

APPENDIX C
E. THE FOLLOWING STIPULATIONS PROPOSED BY RESPONDENTS WERE NOT ACCEPTED BY COMPLAINANT EITHER AS PROPOSED OR AS MODIFIED AND REMAIN IN DISPUTE. BASED UPON ALL OF THE MATERIAL EVIDENCE SUBMITTED, THE DIVISION FINDS AS FOLLOWS:
STIPULATION # 58  The record herein indicates that while each "club" devises its own rules for Bicker, these rules are influenced by Princeton University's rules and regulations.
STIPULATION # 61  The record herein indicates that the rules governing "bickerees" are now devised by the Committee on Bicker Administration. Historically, however, Princeton University has had some degree of involvement with the rule-making process.
STIPULATION # 110  The record herein indicates that Princeton University assumes some oversight responsibilities with respect to the conduct of the members of the all-male clubs.
STIPULATION # 111  The record herein indicates that the activities of the all-male clubs are conducted for the benefit of their members, not the public.
STIPULATION # 112  The record herein indicates that the all-male clubs do not always limit the use of the facilities and services of their clubs to their members in good standing and their guests.
*67 STIPULATION # 118  There is no evidence in the record that will dispute the fact that Tiger Inn does not invite guest lecturers to speak on its premises.
STIPULATION # 121  The record indicates that the all-male clubs are governed by their members.
STIPULATION # 122  The record herein indicates that the all-male clubs' functions and affairs are managed by their members.
STIPULATION # 137  The record herein indicates that Princeton University has no jurisdiction or authority over graduate members of the all-male clubs
STIPULATION # 171  The record herein indicates that when Princeton snowplows travel between University facilities located at the opposite ends of Prospect Avenue, they often clear the public right-of-way (sidewalks) in front of Ivy, Cottage, and Tiger Inn without the all-male clubs' permission.

APPENDIX D
E. THE FOLLOWING STIPULATIONS PROPOSED BY RESPONDENTS WERE NOT ACCEPTED BY COMPLAINANT EITHER AS PROPOSED OR AS MODIFIED AND REMAIN IN DISPUTE. BASED UPON ALL OF THE MATERIAL EVIDENCE SUBMITTED, THE DIVISION FINDS AS FOLLOWS:
58. The record herein indicates that while each "club" devises its own rules for Bicker, these rules are influenced by Princeton University's rules and regulations. (Princeton University's influence does not extend to the internal selection process of each "club")
61. The record herein indicates that the rules governing "bickerees" are now devised by the Committee on Bicker Administration. Historically, however, Princeton University has had some degree of involvement with the rulemaking process. (Princeton University's involvement does not extend to the internal selection process of each "club").
65. Princeton University does not involve itself in the Bicker process but for those descriptions of the "clubs" listed in the Choices handbook distributed by Princeton University to all of its students.
110. The record herein indicates that Princeton University assumes some oversight responsibilities with respect to the conduct of the undergraduate members of the all-male clubs.
111. The record herein indicates that the activities of the all-male clubs are conducted for the benefit of their members, not the public.
112. The record herein indicates that the all-male clubs do not always limit the use of the facilities and services of their clubs to their members in good standing and their guests.
118. There is no evidence in the record that will dispute the fact that Tiger Inn does not invite guest lecturers to speak on its premises.
121. The record indicates that the all-male clubs are governed by their members.
*68 122. The record herein indicates that the all-male clubs' functions and affairs are managed by their members.
137. The record herein indicates that Princeton University has no jurisdiction or authority over graduate members of the all-male clubs.
171. The record herein indicates that when Princeton snowplows travel between University facilities located at the opposite ends of Prospect Street, they often clear the public right-of-way (sidewalks) in front of Ivy, Cottage, and Tiger Inn without the all-male clubs' permission.
F. THE FOLLOWING PROPOSED STIPULATION, IF ACCEPTED, WOULD REQUIRE A CONCLUSION OF THE KIND THAT WILL BE MADE BY THE DIVISION UPON REVIEW OF THE ENTIRE RECORD TAKEN AS A WHOLE. THEREFORE, IT HAS NOT BEEN ACCEPTED OR REJECTED AT THIS TIME.
# 35  Tiger Inn, Cottage and Ivy are bona fide clubs founded for the social and recreational and dining purposes of their members.
NOTES
[1] The hat bid procedure refers to the offering of a bid to a man who went through the application process for the selective eating clubs but was not offered an invitation to join any club. The club selected to offer the hat bid to the unchosen applicant was picked by the roll of a dice.