Allen *v.* Thompson, et al.

No. 42757 December 9, 1963 158 So. 2d 503

*Satterfield, Shell, Williams & Buford,* Jackson, for appellant.

*Creekmore & Beacham, Watkins & Eager, Wells, Thomas & Wells,* Jackson, for appellees.

McELROY, J.

The direct appeal was brought by Lawrence Allen, appellant, complainant below, from adverse decrees entered by the Chancery Court of the First Judicial District of Hinds County, Mississippi. A cross-appeal was made by Lands, Inc. and seeks a reversal of the decree of the chancellor dismissing their cross-bill.

Appellant filed his bill of complaint on March 28, 1962 seeking an alleged equitable claim or right to certain realty against the following parties:

(1) W. J. Thompson, with whom appellant contracted for the sale of land on September 28, 1959, Thompson Investment Company, and Mrs. L. M. Thompson, charging that W. J. Thompson is the party primarily responsible for the confusion and conflicting claims as to rights in the lands in question, that he has been guilty of fraud, trickery, deceit, guile, ruse, and overreaching of complainant in particular and to varying extent has deceived and misled other parties or some of them who are defendants herein; to modify or set aside certain transaction whereby he had been misled in signing of certain contracts and a deed on his Hinds County property and consequently suffering a loss of some $50,000 to $100,000;

(2) Lands, Inc., called Lands, the owner of the property since November 17, 1959 under a warranty deed from Thompson and Allen;

(3) Honorable L. Lamar Beacham, attorney for Lands and Business Development Corporation;

(4) Business Development Corporation, the original holder of a deed of trust securing $60,000 upon the realty involved;

(5) L. N. Muse and Kenneth Muse, called the Muses, charging a joint venture between Thompson and the Muses and charging that the Muses knew and were on notice that Thompson Investment Company did not own the land and that they had particular notice that the

consideration had not been paid to appellant. . . . Because of the knowledge of the failure of consideration due complainant chargeable to said joint venture parties, imputed knowledge of the fraud, Lands, Inc. and Business Development, Inc. are without standing to make any claim against the lands beyond the amount of which complainant has actually received from or through W. J. Thompson, and charging by amendment that Lands, Inc. never came into existence either de jure or de facto as a corporation;

(6) Confederate State Savings and Loan Association of Corinth, the present holder of a second deed of trust in favor of Thompson and Allen, securing $110,000 upon the land;

(7) Merchant and Manufacturers Bank of Ellisville, who now hold the assignment of the first deed of trust, charging as to the Confederate State by amendment that the note of $110,000 was never knowingly endorsed by the complainant, that is, Allen, and was without any consideration and on the face of it showing circumstances putting any subsequent purchaser on notice; and

(8) United Developers, Inc., holder of a contract to purchase from Lands, dated May 18, 1961, charging that its claim should be cancelled or that the balance due to Lands under its contract should be paid in the court for the benefit of appellant's claimed lien.

The questions for the court to decide are: First, was there fraud, trickery, deceit, guile, ruse, and overreaching of the complainant? Second, was Lands, Inc. duly incorporated under the statutes of Mississippi as a de jure corporation or a de facto corporation? Third, were certain defendants here bona fide purchasers for value without notice if there was fraud?

Allen's charges of fraud were denied by Lands, Beacham, Business Development Corporation, the Muses, and the other defendants. The appellees allege affirmatively among other things that Allen had come into equity

without clean hands and that he was barred by estoppel. Confederate States and the bank allege further that they stood as bona fide purchasers for value without notice.

At conclusion of appellant's evidence, the chancellor sustained the motion of these appellees to exclude and dismiss, finding that the proof offered was insufficient to establish fraud on the part of Lands, Inc., Business Development Corporation, Lamar Beacham, Confederate States Savings and Loan Association, Kenneth Muse and L. N. Muse, United Developers, Inc., Mrs. L. M. Thompson and the Merchant and Manufacturers Bank of Ellisville, Mississippi.

At conclusion of the full trial, the chancellor found that no fiduciary or confidential relationship with Thompson was proved, and that no specific acts of fraud or deceit or overreaching of the appellant by Thompson were proved.

During the course of the trial, Thompson introduced numerous carbon copy receipts and cancelled checks showing that he was ahead in his payment of the unsecured note given to the appellant by appellee Thompson Investment Company, and the trial court so found.

The proof showed that the appellant had completed only the sixth grade. However, he was a Trustee in his local church, and demonstrated sharp business acumen. The chancellor's first impression was that the appellant was an ignorant colored man, and that he was somewhat confused over the complex dealings mentioned in the pleading. A reading of the cross examination discloses that the appellant was not ignorant, was very bright, and was confused only when he desired to be confused. Upon matters which he knew to sustain the theory of his case he showed unusual judgment, memory and ability. It was only in these instances where he was hesitant in identifying his own signature that he seemed confused.

The evidence revealed that Allen, as of September 10, 1959, was the owner of 43.10 acres, more or less, in Hinds County, Mississippi involved in the controversy. He began to deal with Thompson, the party he has consistently insisted is primarily responsible for the sale of the property, contending that Thompson's profit was in excess of $2,500 per acre. Allen made a number of varying contracts with Thompson. On September 10, 1959 he executed a warranty deed without a revenue stamp to Thompson Investment Company. This deed was found to be without revenue stamps when the attorneys were examining the records, and they contended, therefore, that the deed was bad. Thompson had other dealings around September 17 or 18.

At the trial Thompson was asked how the deed had come about. He replied that at the time he and Allen were negotiating the sale, Allen came to him and stated that the deal had to be closed that day, that the property had to be gotten out of his name, because he was being threatened with a suit on charges of bastardy.

Further negotiations were finalized by contract of September 28, 1959 providing for the purchase price of $82,500, $37,500 of which was to be paid by transfer of a 50-acre tract of land in Madison County, Mississippi, and the balance of which, plus interest, was to be paid in cash on or before five years.

The contract in part as follows:

"(2). PRICE: The purchase price of the property is Eighty-two Thousand Five Hundred and No/100 ($82,-500.00) Dollars, payable as follows, to-wit:

"(a) The owner, Lawrence Allen, agrees to accept as part payment of the above $82,500.00 a 50 acre tract of land located North of Ridgeland, Mississippi in Madison County and the Purchaser, Thompson Investment Company, a Mississippi Corporation, do hereby agree to sell, warrant and convey that certain 50 acre

tract of land located North of Ridgeland, Mississippi in Madison County as part payment of the above $82,500.00.

"(b) Now, therefore, in consideration of $37,500.00 as trade-in allowance and further consideration of conveyance of the above mentioned 50 acres tract by Thompson Investment Company to Lawrence Allen. It is expressly agreed and understood by both parties that the above 50 acre tract will be conveyed, subject to no liens or *incompetence*. . . .

"(c) The balance of the purchase price is payable as follows:

On or before five (5) years from date of conveyance, with interest at the rate of 6% per annum after maturity.

"(5) It is further agreed and understood by both parties that upon *consumation* of this transaction and the proper conveyance of each party of the above described land and property that Thompson Investment Company will execute and deliver to Lawrence Allen one unsecured promissory note in the amount of $45,-000.00 for the remaining balance owed him on the property he is conveying. Said note is to be payable as stipulated above on or before five years from the date of execution and is to bear interest at the rate of 6% per annum after maturity. . . .

"It is further agreed and understood by the parties, hereto, that Lawrence Allen *have* the right to remove from the property that he is conveying, the tenant houses and house that he is presently living in, at his own expense, providing that said houses are removed from the premises on or before six months from the date of conveyance. . . .

"(7) DEPOSIT: The Buyer, Thompson Investment Company, has deposited with Lawrence Allen $500.00 as earnest money. If the title is merchantable, this de-

posit is to apply to the cash payment and is to be deducted from the $45,000.00 balance, if the Buyer consummates the contract; if the title is not merchantable the Seller is to cure any defects thereof at his own expense unless released by Buyer at his option, in which case the earnest money deposit is to be returned to the Buyer.''

On November 17, 1959 Lawrence Allen and Thompson Investment Company gave a warranty deed to Lands, Inc. in which they received $30,766 as paid and a note for $110,000. The deed was duly acknowledged and put of record. The notes were signed by Lawrence Allen as well as receipts given for money that was paid and passed back to Thompson Investment Company. The court found that these were the signatures of Lawrence Allen. There is testimony to the effect that Lawrence Allen told them that he was satisfied, that he had been satisfied, and that was the reason he had signed these papers and transferred this property to Lands, Inc. and also assigned the notes back to the parties as shown in the record.

Allen identified his signature on the contract during cross examination. During the numerous examinations and passings of title, attorneys examined Allen's title and it was determined by Mississippi Valley Title Insurance Company and others that affidavits showing the heirs of Decatur Allen, deceased, would be required. Thompson was asked if Allen knew the affidavits were being drawn up. He replied that the affidavits could not be written without Lawrence giving Mr. Alexander the facts about history of Lawrence Allen's family, that Lawrence had given Mr. Alexander the information, and that the affidavits were prepared a couple of days later. These affidavits were called false affidavits and were so designated by the appellant. The affidavits were secured and carried to Neal and Houston, attorneys representing the Kansas City Title Insurance Company.

Those attorneys, assuming the affidavits to be correct and thus assuming Allen to own the fee title, handled the title examination in connection with Thompson's negotiation with H. C. Bailey. Bailey contemplated purchase of the land, but this did not materialize.

In his long testimony Allen said that he did sign certain papers and that he did not sign certain papers. When confronted with a signature, if he thought it was to his advantage, he would testify that he signed this paper. If he thought it was not to his advantage, he would say that he didn't sign it. There were four or five different contracts signed. Some of them were acknowledged and some were placed of record. Allen himself testified that he received around eighteen thousand dollars, but that they owed him a lot more money. He said he left the land in Hinds County, originally road land, or Canton Road land, and went on the Ridgeland land which is in Madison County; that there was a deed of trust obtained against this land, and that he received the $4,000 check which he had borrowed from them on the land. He also stated that he never paid any more taxes on the land in Hinds County after he moved off of the land; that he did pay taxes on the land in Madison County. There is a lawsuit pending in Madison County to cancel certain deeds of trust that are made on this land. It took four days of trial before the chancellor gave his summary of the case and his opinion as follows:

" . . .

"When Lawrence Allen, the Complainant, first testified as a witness, the Court's first impression was that he was an ignorant colored man, not too bright, and somewhat confused over the complex dealings mentioned in the pleadings. Lawrence Allen was slow in answering questions propounded to him. His tendency was to deny his signature on any and all instruments which would tend to give any rights to other parties.

His attitude was one of suspicion toward any instrument that was presented to him on the witness stand for examination and inspection. Subsequent testimony from other witnesses, and a second appearance of Lawrence Allen on the witness stand, has convinced this Court that its first impression of Lawrence Allen as a person was wrong. This Court believes now that Lawrence Allen was not taken advantage of in the transactions complained of in his Bill of Complaint, that he was not the victim of overreaching and domination by W. J. Thompson and others, but that he was fully capable and experienced and able to take care of himself in transactions involving the conveyance of real property, the assignment and transfer of instruments evidencing indebtedness, the mortgaging of real property, and any other instruments effecting the transfer of real estate or interests therein.

"Ten acres of the 48½ acres subsequently sold by Lawrence Allen were purchased by him on July 30, 1949 for $3,000.00, which is an average of $300.00 per acre. Twenty acres of the 48½ acres subsequently sold by him were purchased on March 13, 1950 for $5,000.00, or an average of $250.00 per acre.

"Lawrence Allen entered into a contract with Thompson Investment Company on September 28, 1959 for the sale of 48½ acres for $82,500.00. It took approximately $5,000.00 expended by Lands, Inc. to cure defects in the title to a part of this acreage, so actually Allen received for this property slightly over $1,800.00 per acre, the majority of the acreage sold having been purchased by Allen as above outlined for $250.00 and $300.00 per acre. This kind of profit does not prove an overreaching or a dominating of the seller by the purchaser. It is true that of this $82,500.00 purchase price there was a trade-in allowance of $37,500.00 for approximately fifty acres of land in Madison County near Ridgeland, Mississippi.

"Soon after the execution of the Memorandum of Sale and Purchase of Real Estate on September 28, 1959, Lawrence Allen went into possession of the acreage in Madison County and began to exercise acts of ownership thereon. He also followed through on this said Sale and Purchase Contract by removing and selling some of the houses on the Old Canton Road acreage. He accepted installment payments on the $45,000.00 note executed by the purchaser on November 17, 1959 and referred to in the Sale and Purchase Contract of September 28, 1959. The only part of the Sale and Purchase Contract not fulfilled is the payment of installments on the $45,000.00 note of Thompson Investment Company in favor of Lawrence Allen, not yet due.

" . . ., while Lawrence Allen did not receive for the Old Canton Road acreage the price per acre that the passage of time and subsequent events have proved could be realized from this acreage on long trades, still Lawrence Allen did receive a reasonable consideration for this acreage with the lights before him and other parties in September, 1959; that no fiduciary or confidential relationship with W. J. Thompson was proved, and that no specific acts of fraud or deceit or overreaching of the Complainant by W. J. Thompson were proved."

██ ██ It is the uniform rule that the chancellor's finding on the facts is reviewable on appeal only when manifestly wrong, and when two or more reasonable inferences are deducible from the facts, the inference drawn and adopted by the chancellor will control on appeal. This rule has its foundation not only in the imperative operation of the constitutional ordinances mentioned; it has a further control and reason in this: the opportunities afforded to the trial court are far better for arriving at correct conclusions and findings from all of the questions of fact. Of this matter our Supreme Court has said: " 'Here we have nothing but

the naked record before us; there, in most cases, the parties themselves are in the presence of the court and testifying. The manner of testifying, and their appearance upon the witness stand, and many other things, are influential in determining the triers of fact;' or as said in another case: The decision of the chancellor where the evidence is conflicting will not be disturbed on appeal, since he is better able to determine the truth of the matter than the appellate court. And, this rule still holds true, although incompetent evidence has been admitted, if nevertheless there is enough competent evidence to sustain the decree.'' Griffith, Miss. Chancery Practice, 2nd ed. 1950, '§ 674.

We do not believe that the chancellor was manifestly wrong in his finding that there was no fraud on the part of W. J. Thompson or W. J. Thompson Investment Company, and in his finding that these were armlength dealings between the two parties.

This Court has repeatedly held that a chancellor's finding of fact is reviewable only when it is manifestly wrong. Abraham v. Harvey, 245 Miss. 449, 147 So. 2d 639.

 In charging fraud Allen undertook the burden of proving his allegations by clear and convincing evidence. This principle is illustrated in Locke v. Friedman, Keiler & Co., 90 Miss. 5, 43 So. 673, where this Court said: ''. . . is the court warranted, by testimony clear, convincing, and satisfactory, that the fraud alleged has been established? . . . Fraud must not only be proven, but proven clearly and convincingly, and we are driven to the. conclusion that the evidence in the record, taken as a whole, fails to meet the rule — fails to satisfy clearly and convincingly that there was such fraud as is alleged. . . . Fraud is not a thing to be lightly charged, and most emphatically is not a thing to be lightly established. The stigma which follows from it is not to be placed upon parties, unless the evidence

measures squarely up to the requirements of the rule of satisfying a court clearly and convincingly of the truth of the fraud.''

The appellants' next contention is that Lands, Inc. never did come into existence, was never either a de jure or de facto corporation, and therefore could not take legal title to the land through a deed executed to them on November 17, 1959, that Lands, Inc. was not legally entitled to do any business or was not in existence for that purpose on either November 17 or November 18, 1959, or until November 26, 1959. Chapter 209, Miss. Laws 1954, now Section 5311.5 of Mississippi Code 1942, Rec., expressly forbids the doing of business by any corporation before $500 has been paid in for capital stock, and the charter of Lands, Inc. contains this provision. The $500 had not been paid in to Lands, Inc. On November 19, 1959 checks were given as the first payment for stock, but one check bounced and was not made good until November 27, 1959.

The incorporators of Lands made a bona fide effort to organize a corporation. The Charter of Incorporation was secured on November 17, 1959, and Lands has since engaged in business as a corporation.

Five hundred shares of capital stock were subscribed for on November 17. A joint meeting of incorporators and subscribers of capital stock was held on the same date; and the organization of the corporation was carried out, officers and directors were elected and the purchase of the real estate was authorized. All of this appears from proper corporate minutes. Bylaws were adopted. The Charter was recorded on November 21 and published on November 28. The required Report of Organization was filed with the Secretary of State on December 1. Lands has since operated as a corporation in every particular and all of its relevant corporate records were examined by Allen's counsel prior to trial.

Kenneth Muse and L. W. Muse each subscribed for 125 shares of capital stock on November 17, 1959, and said 250 shares were paid for on November 19. Thompson Investment Company subscribed for 250 shares on November 17 and issued its check for $250 on November 19. The checks were deposited to the corporate bank account on November 20, and on November 24 Thompson's check was returned as unpaid. It was redeposited by Lands on November 27 and cleared.

The entire transaction between Allen, Thompson and Lands, Inc., was handled with the latter being treated by everyone, in good faith, as a corporate entity. Therefore, under the complainant's proof at the trial, there is no question but that (a) there was a bona fide attempt to organize a corporation under valid statutes, and (b) there was and has consistently been actual exercise of corporate powers.

The appellant arguse that Lands, Inc., never came into legal existence and cites Section 5311.5 of the Mississippi Code of 1942, as follows:

"From and after the effective date of this act, no corporation having capital stock shall transact any business or incur any indebtedness, except such as shall be incidental to its organization or to obtaining subscriptions to or payment for its shares, until there has been paid in for the issuance of shares consideration of the value of at least five hundred dollars ($500.00)."

A technical violation of the above statute would not alter the conclusion that Lands, Inc., was a de facto corporation and that Allen, as the grantor, cannot attack the corporation's legality or its ability to acquire title to land.

■■ ■ The general rule with reference to de facto corporations is stated in 18 C.J.S., Corporations, as follows:

"§ 93. De Facto Corporations in General. . . . A de facto corporation, on the other hand, is an association

which actually exists for all practical purposes as a corporate body, but which, because of failure to comply with some provision of the law has no legal right to corporate existence as against a direct attack by the state. It may be ousted in a direct proceeding brought by the state for that purpose, as shown infra '§ 118, but with a few exceptions which will be explained later it has a corporate existence even as against the state on a collateral attack, and as against individuals and other corporations, whether they attack its right to corporate existence collaterally or directly, as will appear infra '§ 94 et seq.

 ■ "'§ 94. Effect of De Facto Corporate Existence in General. The general rule, supported by an almost unanimous consensus of judicial opinion, and sometimes expressly declared by statute, is that the legality of the existence of a de facto corporation can be questioned only by the state in a direct proceeding, and cannot be collaterally attacked or litigated in actions or proceedings between private individuals or other corporations or between them and the alleged corporation. . . .

"'. . .

"'§ 99. What Constitutes De Facto Existence. . . . the general rule is that there is a de facto corporation, so that the legality of its corporate existence cannot be attacked collaterally, as explained supra '§ 94 et seq., where there is a special act or general law under which such a corporation may lawfully exist, a bona fide attempt to organize under the law and colorable compliance with the statutory requirements, and actual user or exercise of corporate powers in pursuance of such law and attempted organization; . . .''

The above text was cited with approval and the same rule announced in United Sewing Machine Distributors v. Calhoun, 231 Miss. 390, 95 So. 2d 453. In that case the Court actually held on the facts that there was fraud as against the creditors in the attempted organization

of a corporation by a husband and wife. However, the Court announced the general rule as follows:

"Under Section 5310, Code of 1942, Annotated, it was necessary that a copy of the charter, within 30 days after it had been granted, should be published in a newspaper of the county, as therein provided. By Code Section 5320, the corporation was required, within 60 days after its organization, to make report thereof to the Secretary of State. By Code Section 5324 it was required to have the charter recorded in the office of the Chancery Clerk of Hinds County. These requirements were not observed.

"13 Am. Jur., Corporations, Section 49, p. 195, lays down the requisites for the existence of a de facto corporation as: '(1) a valid law under which a corporation with the powers assumed might be incorporated; (2) a bona fide attempt to organize a corporation under such law; and (3) an actual exercise of corporate powers.' See also 18 C.J.S., Corporations, Sec. 99, pp. 494-495."

The undisputed facts in this record confirm that ". . . there was an attempt in good faith to create a corporation and that in like good faith there has been an assumption and exercise of corporate functions." 13 Am. Jur., Corporations, Sec. 53.

██ █ Counsel says that the statutory requirement applicable here is a condition precedent but no authorities to that effect are furnished. In most, if not all, instances where statutes prohibit the corporation from transacting business before the stock has been subscribed or paid for, a failure has not precluded the creation of at least a de facto corporation. Cf. American Radiator Co. v. Kinnear, 56 Wash. 210, 105 P. 630; McKay v. Garman, 89 Wash. 23, 153 P. 1082; and Standard Drilling Co. v. Slate, 205 Ky. 714, 266 S.W. 377.

██ █ The general rule is announced in Thompson on Corporations (3d ed.), Vol. 1, p. 297 et seq., as follows:

"... Generally speaking, a corporation de facto exists where certain persons have attempted, in good faith, under existing laws, to organize a corporation for some specific purpose permitted by such laws, and such corporation so attempted to be formed has exercised corporate functions for an indefinite time, and has in good faith been carrying out the purpose for which its incorporation was attempted; but where, in such attempted incorporation, some prescribed legal requirement has been accidentally, or unintentionally omitted, or where, by ignorance or oversight, all statutory requirements have not been substantially complied with."

In Ferguson v. Oxford Mercantile Company, 78 Miss. 65, 27 So. 877, where creditors of a purported corporation sought to set aside a conveyance by the corporation to a bank as being void and of preference and alleging that the corporation was defectively organized and could not convey to the bank, the Court, in holding otherwise, used the following language:

"... If the bank transcended its charter and loaned a larger percentage of its capital to the mercantile company than its charter authorized it to lend to any one person, that was a matter between it and the state ... Section 5 of the charter of the company authorizes it to commence business 'when as much as forty per cent. of the authorized capital has been actually paid in.' It is shown that goods of the value of 50 per cent. of it were put in. This is enough, and in any case this was a matter for the state, and could not affect the rights of creditors in good faith. ..."

Thompson's text, in Section 256, discourages the very argument the appellant advances by pointing out the courts themselves "... are not always agreed upon that statutory requirements are to be considered prerequisites or conditions precedent to corporate existence. ... it makes obligatory to the existence of a corporation de facto the performance of all statutory requirements,

and imposes upon businessmen and laymen the duty of determining, at their peril, what the courts themselves are not agreed upon. . . . If courts are to follow such an arbitrary rule, then the entire doctrine of corporations de facto had as well be swept from the law of corporations.''

Lands, under the reasonable construction of corporate law and under our own decisions, was a de facto corporation.

Since we are holding that there is no fraud, trickery, etc., and that the contracts between Lawrence Allen and Thompson and W. J. Thompson Inc. were contracts held without fraud and at arms length, and that Lands, Inc. was duly incorporated at least as a de facto corporation able to do business, it is unnecessary for us to pass on the question of certain defendants being bona fide purchasers of value without notice.

There was a cross-bill filed by Lands, Inc. alleging breach of warranty on the part of the plaintiff and cross-defendant, Lawrence Allen, and this cross complainant outlined damages of around $5,000 resulting from this breach of warranty.

The sale and conveyance of this Old Canton Road acreage by Lawrence Allen and Thompson Investment Company to Lands, Inc. in November, 1959, was worked up by W. J. Thompson, President of Thompson Investment Company, and the warranty deed was from Allen and Thompson Investment Company. The testimony of the President of Lands, Inc., L. Lamar Beacham, was that Lawrence Allen protested that he had no further interest in the Old Canton Road acreage, it having been sold to Thompson Investment Company. Allen finally signed the warranty deed to Lands, Inc. at the insistence of the President of Lands, Inc. In its cross-bill, Lands, Inc. avers that it did not find out about the defects in the title until 1961, almost two years after the conveyance to it of this acreage. Lands, Inc. is

attempting to recover from only one of the grantors, Lawrence Allen. Lands, Inc. has a paper profit from the subsequent sale of this 48½ acres and other small acreage of approximately $61,000. Lands, Inc. does not offer to convey back this acreage to Lawrence Allen and Thompson Investment Company and to call the whole deal off because of the subsequently discovered and subsequently cured defects in the title, but merely seeks damages from one of the grantors. This court feels that in equity and good conscience, Lands, Inc. is not entitled to recover any of these expenses which it alleges it incurred in curing the title to a part of the Old Canton Road acreage. These were the findings of the learned chancellor and the bill of complaint was dismissed on the evidence presented and as shown by the record. We are of the opinion that the court was not manifestly wrong in the dismissal of the cross-bill.

The case is affirmed as to the dismissal of the original bill of complaint and also affirmed as to the holding of dismissal of the cross-bill.

Affirmed.

*Lee, P. J., and Kyle, Rodgers and Jones, JJ.,* concur.