## IN THE SUPREME COURT OF MISSISSIPPI
### NO. 1999-CA-01130-SCT

*BRYAN ELLIS DILL*

*v.*

*SOUTHERN FARM BUREAU LIFE INSURANCE COMPANY, WALTER E. MOSELEY, ADMINISTRATOR OF THE ESTATE OF MARY ELIZABETH MOSELEY DILL AND TAYLOR ELIZABETH DILL*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/08/1999 |
| TRIAL JUDGE: | HON. ROBERT L. LANCASTER |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | THOMAS L. KESLER |
| ATTORNEYS FOR APPELLEE: | J. TYSON GRAHAM |
| | JOSEPH JOSHUA STEVENS JR. |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | AFFIRMED - 01/25/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 2/15/2001 |

**EN BANC.**

**WALLER, JUSTICE, FOR THE COURT:**

¶1. This case arises from the Lowndes County Chancery Court's dismissal of Bryan Ellis Dill's claim to certain life insurance funds which had been interpled into the registry of the court. Southern Farm Bureau Life Insurance Company and Blue Bonnet Life Insurance Company interpled $213,000 in life insurance benefits arising from the death of the insured, Mary Elizabeth Dill ("Liz"). A third insurance company, AFLAC, having in effect a policy in the amount of $12,000, was later joined. Both the Estate of Liz Dill, and the Dills' minor daughter, Taylor, by and through her guardian ad litem, asserted that Bryan was not entitled to the life insurance proceeds because of his complicity in the death of Liz, his wife. The trial court found that Bryan had intentionally and wilfully killed Liz and was therefore precluded from sharing in the insurance proceeds. It then entered a final judgment under Rule 54(b) denying Bryan's claims. Bryan appeals and raises only one assignment of error: Did the Lowndes County Chancery Court erroneously apply the preponderance of the evidence quantum of proof? This case is apparently one of first impression in Mississippi as this Court has never definitively addressed the proper quantum of proof in a dispute over life insurance benefits.

### STATEMENT OF THE FACTS

¶2. Bryan's involvement in Liz's death is based on circumstantial evidence and requires a full development of the facts surrounding this event. Liz disappeared from her home late in the evening of April 4, 1996, or in

the early morning hours of April 5, 1996. Bryan reported Liz missing a little after 7:00 a.m. on April 5. On April 9, Liz's body was discovered in a wooded area in rural Lowndes County. She had been raped and murdered, and her body was partially mutilated. Two brothers, Darnell Baldwin and Clint Baldwin, have been convicted of Liz's capital murder. Darnell's conviction of capital murder and life sentence were affirmed by this Court on appeal. *See Baldwin v. State*, 757 So. 2d 227 (Miss. 2000). DNA evidence conclusively linked him as the person who raped Liz. Her murder was accomplished with one shot from a high velocity rifle to the back of the head. The mutilation, which occurred post mortem, included the removal of skin on the face, neck, and upper chest and the removal of the left breast, all achieved by the use of a sharp knife.

¶3. On the day before her disappearance, Liz had been treated at a hospital emergency room for severe back pain. She was having trouble walking; in fact, when the housekeeper and babysitter, Kelly Terrell, arrived at the Dills' home, Liz was crawling on the floor to get to the kitchen. When Terrell left the house late that afternoon around 4:30 or 5:00, the living room had not been picked up and the carpets had not been vacuumed. Terrell claimed that Bryan never cleaned; a witness who was Liz's friend and former roommate testified that Liz was a poor housekeeper.

¶4. On the day of her disappearance, Liz had returned to the hospital for more tests, and she was given a prescription for pain medication. Liz's mother was keeping Taylor so that Liz could rest.

¶5. Bryan had planned on attending a cook-out with a group of friends at a cabin about 15 minutes away known as "the Shack." When he left for the party that evening, Liz was on the couch and the doors to the house were locked. There were four keys to the house: Liz, Bryan, and Liz's mother each had a key, and there was a key hidden in the carport attic.

¶6. Bryan went to the Shack for a party attended by 12 to 15 friends. The Shack was frequently used as a party place by his friends who were often there several times a week. It was also used as a hunting cabin and hunting dogs were kept there. The Shack was rented from the Baldwin family, and the Baldwin brothers lived very close by. Patty Holliday, with whom Bryan was admittedly having an affair, was present. Apparently, the affair had been going on for years. Liz knew of the affair and was unhappy with Bryan about his relationship with Holliday and his failure to help in the rearing of their daughter. Holliday has been living with Bryan in the home owned by Liz since December of 1997.

¶7. Around midnight, the Baldwin brothers arrived at the Shack in Darnell's old Monte Carlo. The car had no mufflers and made a loud noise when it was in operation. Bryan spoke with the Baldwins and then they left. Bryan claimed that the Baldwins returned around four hours later. Holliday saw the Baldwins at the Shack around 2:30 a.m., they again spoke with Bryan for a few minutes, and the Baldwins' car returned around 4:00 a.m. Holliday also says that another party attendee, Jimmy Cash, spoke to the Baldwins at 4:00 a.m. Holliday and Bryan left the Shack in separate cars around 5:00 a.m.

¶8. Kelly Terrell arrived at the Dill home around 8:00 or 8:30 the morning that Liz's disappearance was reported. According to Terrell, the living room was picked up and the carpet had been vacuumed. Terrell also looked for the key that was usually hidden in the carport attic and noticed that it was missing. Bryan told Terrell that he would report the missing key to the police detectives.

¶9. Amanda Lemmons was also present at the Dill home that morning. She likewise stated that the house was neat and that Liz's purse and keys were on the couch. Amanda worked with Liz at Community

Counseling. Liz trained Amanda and, about 3-1/2 weeks before her death, Liz had telephoned Amanda to explain to her what life insurance policies were available by virtue of her employment at Community Counseling. Bryan was present when Liz made the telephone call. The Blue Bonnet Life Insurance Policy was purchased by Liz through her employment at Community Counseling.

¶10. Investigation of the home on the morning of Liz's reported disappearance showed no signs of forced entry. A .25 caliber handgun was the only thing missing from the home.

¶11. Bryan made several statements to police and friends concerning Liz's disappearance and murder. He also testified at the criminal trials of the Baldwin brothers and by video deposition in this case. Bryan told his mother-in-law that he had locked the door when he left for the party at the Shack on the night of April 5. He went back to get something and could not remember if he locked the door the second time he left.

¶12. Bryan told Officer Marc Miley that he had locked the door when he left but, upon returning, had knocked for Liz to let him into the house. When Miley first arrived to investigate the disappearance, Bryan told him that he feared that Liz had committed suicide because she had been upset about bad results from tests on her back. When Miley returned with a search crew around 9:40 a.m., he noted that the washer and dryer were in use. There was a .223 caliber rifle with a pistol grip, a high velocity weapon capable of causing the fatal gun shot wound, on the kitchen table. The gun was also spotted by Officer Rick Speed, the first police officer to arrive at the scene, at 7:21 a.m. The gun was breached, and there were cleaning items with it on the table. Officer Kevin Petri picked up the weapon, smelled the barrel, and reported that the weapon had been recently fired. Bryan said that he had fired the weapon that morning at a crow in the yard.

¶13. Bryan was adamant in his suspicion that a neighbor had taken Liz for the purpose of satanic rituals. The neighbor was investigated but was later dismissed as a suspect because the police determined that he was nothing more than a harmless eccentric.

¶14. A neighbor reported hearing a loud car in the Dills' driveway for over five minutes on the night of Liz's disappearance, but no neighbor testified to hearing gunfire.

¶15. Another neighbor, Carolyn Bogie, reported hearing a woman scream and an idling car on the hill in the area of the Dill house. She also heard male voices, and dismissed the racket as teenage vandals. Bogie testified that she relayed this information to Bryan and he responded with his belief that his eccentric neighbor was responsible. Bogie was upset by Bryan's allegations of satanic rituals and, fearful of Bryan, did not relate the conversation to the police.

¶16. The police interviewed Bryan on April 8. He reported that Liz had between $12,000 and $25,000 in life insurance, saying that her annual salary was more than the insurance proceeds and he therefore had no motive to kill her. Officer Mulligan informed Bryan that no life insurance proceeds would be paid until a body was found. The body was discovered the next day on April 9. Evidence revealed that the body had been transported to the location where it was discovered. In a subsequent interview on April 23, the police inventoried and took possession of Bryan's 24 guns. Bryan claimed he did not know how much life insurance Liz had.

¶17. On the day that the body was found, the police had been informed from interviews with the other party attendees that the Baldwins were at the Shack the night of Liz's disappearance and the Baldwin residence was about 15 minutes from where the body was found. Two officers went to the Baldwins' house

to talk with them. Darnell was present, as was the Monte Carlo car. He was very nervous, and the officers became suspicious. The officers were out of radio and phone range and had to leave the house to request assistance. When they returned, Darnell and the Monte Carlo were gone. The car was reported stolen on April 17. It was found in August of 1996 in Alabama. The car was completely burned, and no physical evidence could be recovered.

¶18. In late April, Bryan went to see Guy Marian, Liz's boss at Community Counseling. Marian informed Bryan of the $200,000 life insurance coverage from Blue Bonnet and AFLAC. Marian also gave Bryan the necessary documentation to make claim to the funds, which Bryan completed and returned to him on May 1, 1996. On May 1, Bryan also executed proof of claim to Farm Bureau, and on May 8, 2000, he executed a proof of claim with Commercial Life Insurance Company for a $15,000 policy. The $15,000 was paid into the Estate, and Commercial Life is not a party to this action. On May 7, Bryan told detectives that he was only aware of $12,000 in life insurance benefits. In late May, Bryan told Detective Joe Young that he would receive only a "dab" of life insurance.

¶19. Bryan was aware that he was a suspect in his wife's death. He told police that, after thinking about it, he had recollected that Darnell had told him that night at the Shack that he had a "white woman" in the car. Bryan claims that he did not suspect at the time that it was his wife and just walked away. Bryan wished that he had stayed because maybe the Baldwins would have made a ransom demand. Bryan then suggested that the police look at Weaver Road as the possible crime scene or that the car might be there. The car was discovered near Weaver Road in August of 1996. In his deposition and at trial, Bryan said that Clint had surreptitiously told him that there was a woman in the car so that Darnell could not hear. Bryan believed that Darnell was the mastermind of the scheme to abduct, rape, and murder Liz, and that Clint had just gone along with it.

¶20. On April 10, the evening after Liz's body was recovered, Danny Hickman, a bounty hunter and private investigator, spoke with Bryan and a mutual friend to offer his assistance. Bryan told Hickman that evening that when the Baldwins came to the Shack they told Bryan that they had a white woman in the car and that something would happen to her if he, Bryan, did not lend them some money. Bryan's story to Hickman was that the Baldwins had made that demand twice, at midnight and 2:00 a.m., and that Bryan, not realizing it was his wife, told them to do whatever because he would not give them any money. Bryan told Hickman to look for the Monte Carlo, the whereabouts of which Bryan claimed to know. He denied that there was any life insurance proceeds but Bryan told Hickman that he was afraid to tell the police detectives he was looking for the car because they might use it against him. Hickman and Bryan agreed that they would go to look for the car the next morning, but when Hickman showed up at the house to get Bryan, no one answered. Hickman left and had no more contact with Bryan.

¶21. Stanley Abrams gave a statement implicating Bryan in Liz's death to the police based on information given him by Clint. Abrams was arrested along with Clint in July of 1996 for intimidating a witness, but Abrams has not been prosecuted. Shortly before Clint's trial, Abrams and Bryan were seen talking. Abrams has since been charged with perjury arising from his testimony at Clint's trial. Abrams had previously worked, hunted, and fished with Bryan. Abrams pled "the Fifth" when asked about Clint's statements to him, or Abrams's statement to police.

¶22. Scott Rushing, one of Bryan's friends, testified that Bryan told him that, the second time they arrived at the Shack on the night in question, the Baldwins told Bryan that "your b**** is in the car." Rushing was

also present when one of Bryan's employees told Bryan that Liz's body had been found. When the Sheriff arrived, Bryan's first question to the Sheriff was, "How bad is she messed up?" This question may have been the result of information provided by Rushing or part of Bryan's plan to add fuel to his insistence that Liz had been abducted for use in a satanic ritual.

¶23. Randy Jamison saw Clint about 4:00 a.m. on the morning of April 6. Clint was visibly shaken and vomiting, and he had a large sum of money on his person.

¶24. Brian Post witnessed a confrontation between Darnell and Bryan a few months before the murder. Post also claimed to have noticed the door to the Dill home cracked open around 10:00 p.m. the night of Liz's disappearance. Post worked for Bryan at the same time as Abrams and Clint and testified that Clint hunted and fished with Bryan. One of Bryan's employees testified that Post had stated the door had been partially opened around 11:30 p.m.

¶25. Bryan stipulated that he was in bad financial shape at the time of Liz's murder. Liz had guaranteed a loan for Bryan to buy a pick-up truck.

¶26. Liz's estate includes the $15,000 life insurance proceeds from Commercial Life and the Dill home, which is titled exclusively in Liz's name and which she had purchased prior to her marriage to Bryan. Liz died intestate, leaving as her sole heirs Bryan and her daughter Taylor.

¶27. The Chancellor, applying a preponderance of the evidence quantum of proof, ruled that, more likely than not, Bryan had wilfully and intentionally caused the Liz's death. The Chancellor concluded that the case was one of circumstantial evidence, turning on the credibility of Bryan Dill. The Chancellor specifically found that Bryan was not at all credible. Bryan's statements were evasive and inconsistent, ambiguous and incomplete. For that reason, the Chancellor was not persuaded by Bryan's explanations.

¶28. Further evidence of Bryan's complicity in Liz's death were found by the Chancellor as well. The Baldwins had no motive of burglary or robbery since nothing of value was taken from the home. There was no forced entry, and the Baldwins had access to the spare key, which Bryan could have told them was in the carport, and which Bryan later failed to report missing. Bryan had arranged for Liz to be home alone in her weakened condition and himself to have an alibi by attending the party that evening. Bryan nonetheless had contact with the Baldwins on three occasions that evening. Bryan had previous relationships with the Baldwins to provide opportunity for conspiracy.

¶29. Bryan did not have affection for his wife. He left his wife when she was in severe pain and frightened of negative test results to party with his friends and have sex with his girlfriend. He did not return until sunrise.

¶30. Liz's body was found within a short time (less than a day) after Bryan was informed a body was necessary to collect the insurance money. Obviously, the Baldwins could have disposed of the body in the burned Monte Carlo, but did not because the body was needed to collect the insurance proceeds. The body was placed in a location where it would be promptly found. The condition of the body was to obscure motive and divert attention to the Dills' neighbor, as Bryan had alleged the neighbor's involvement from the very beginning. The body was obviously well preserved for the three days prior to its discovery.

¶31. Bryan was in possession of a high velocity weapon which could have been the murder weapon. When asked about its recent firing, Bryan had given a "ridiculous" story about shooting at a crow and then later

denied having made that statement. There was no explanation for the gun, shells, and cleaning equipment to be on the kitchen table that morning. The cleaning and vacuuming when Liz was unable to do so and Bryan had no history of such is equally highly suspect. Bryan had opportunity to clean up between the time he left the Shack at 5 a.m. and reported Liz missing a little after 7 a.m.

¶32. Bryan's statements that he did not know how much life insurance was at stake are "not worthy of belief." Bryan's statements to Hickman, Rushing, and Detective Young that mention the Baldwins talking with him about his wife being in the car and them wanting money is highly indicative of the crime. Clint Baldwin was seen later the morning after Liz's disappearance with a large sum of money.

¶33. The Chancellor also considered, over hearsay objections, the trial testimony of Lonnie Harris that Darnell Baldwin said that he was paid by a woman's husband to rape, kill, and cut her up. Michael Ball testified that Clint Baldwin told him that he and Darnell were paid to dispose of a body, but ended up killing the woman. Written statements by Derrick Guyton and Stanley Abrams provide even more direct evidence that Bryan conspired to kill his wife. Even though that direct evidence is suspect as it comes from other convicted criminals[1] along with all of the circumstantial evidence, it shows that the evidence is "overwhelming." Considering all of the evidence, the chancellor determined that Bryan had wilfully procured the death of his wife and was not entitled to any of the interpled life insurance proceeds.

## STANDARD OF REVIEW

¶34. "'This Court will not reverse a Chancery Court's factual findings, be they of ultimate fact or of evidentiary fact, where there is substantial evidence in the record supporting these findings of fact." *Smith v. Jones*, 654 So. 2d 480, 485 (Miss. 1995) (quoting *Cooper v. Crabb*, 587 So. 2d 236, 239 (Miss. 1991)). Furthermore, if a chancellor's findings are supported by substantial evidence, they will not be disturbed unless the chancellor abused his discretion, was manifestly wrong or clearly erroneous or applied an erroneous legal standard." *Williams v. Williams*, 656 So. 2d 325, 330 (Miss. 1995); *Smith*, 654 So.2d at 485; *Chamblee v. Chamblee*, 637 So. 2d 850, 860 (Miss. 1994), *quoted in* **Brocato v. Brocato**, 731 So. 2d 1138, 1140 (Miss. 1999).

## DISCUSSION

¶35. This Court has held that a beneficiary who had wilfully taken the life of an insured could not recover the proceeds of a life insurance policy. *Gholson v. Smith*, 48 So. 2d 603 (Miss. 1950). In *Gholson v. Smith*, the Court found that the evidence showed that the beneficiary had wilfully and without justification in law killed the insured. *Id.* at 605. However, the Court did not specifically set forth what quantum of proof was used in weighing the evidence.

¶36. In the case sub judice, the learned Chancellor dutifully and carefully analyzed the law and evidence and chose to apply the preponderance of the evidence quantum of proof. As cited by the Chancellor, this decision is not without substantial precedent in other jurisdictions. *See Horn v. Cole*, 156 S.W.2d 787 (Ark. 1941); *Liodas v. Sahadi*, 562 P.2d 316 (Cal. 1977); *Cooper v. Spring Valley Water Co.*, 116 P. 298 (Cal. Ct. App. 1911); *Stone v. Union Fire Ins. Co.*, 107 P.2d 241 (Col. 1940); *Verrastro v. Middlesex Ins. Co.*, 540 A.2d 693 (Conn. 1988); *Schaffer v. Lindy*, 511 A.2d 1022 (Conn. App. Ct. 1986); *Cheatle v. Cheatle*, 662 A.2d 1362 (D.C. Ct. App. 1995); *Carter v. Carter*, 88 So. 2d 153 (Fla. 1956); *Eskridge v. Farmers New World Life Ins. Co.*, 621 N.E.2d 164 (Ill. App. Ct. 1993); *Shelby Mfg. Co. v. Harris*, 44 N.E.2d 315 (Ind. Ct. App. 1942); *Neises v. Solomon State Bank*, 696

P.2d 372 (Kan. 1985); *Prince v. Aetna Cas. & Surety Co.*, 129 So. 2d 71 (La. Ct. App. 1961); *Hinds v. John Hancock Mut. Life Ins. Co.*, 155 A.2d 721 (Me. 1959); *Ford v. Ford*, 512 A.2d 389 (Md. 1986); *Lopez v. New Jersey Bell Tel. Co.*, 240 A.2d 670 (N.J. 1968). *Jones v. All American Life Ins. Co.*, 316 S.E.2d 122 (N.C. Ct. App. 1984); *Shrader v. Equitable Life Assurance Society*, 485 N.E.2d 1031 (Ohio 1983); *State Mut. Life Assurance Co. of America v. Hampton*, 696 P.2d 1027 (Okla. 1985); *Millar v. Semler*, 3 P.2d 987 (Or. 1931); *Taglianetti v. New England Tel. & Tel. Co.*, 103 A.2d 67 (R.I. 1954); *Rutledge v. St. Paul Fire & Marine Ins. Co.*, 334 S.E.2d 131 (S.C. Ct. App. 1985); *Horrell v. Utah Farm Bureau Ins. Co.*, 909 P. 2d 1279 (Utah Ct. App. 1996).

¶37. A Mississippi federal district court similarly applied a preponderance of the evidence standard to a case such as this one. *Davis v. Continental Cas. Co.*, 560 F. Supp. 723 (N.D. Miss. 1983). While that case is not controlling, in light of the obvious majority of other jurisdictions applying the same quantum of proof, we are persuaded that the Chancellor applied a correct legal standard in this case.

¶38. Bryan believes that the Chancellor applied an erroneous legal standard in concluding that the quantum of proof was preponderance of the evidence. Bryan's argument is that this case involves fraud against an insurance company, a situation in which this Court has concluded that the correct quantum of proof is by clear and convincing evidence. *See McGory v. Allstate Ins. Co.*, 527 So. 2d 632 (Miss. 1988). In *McGory*, the insurance company brought suit against the insureds to divest them of proceeds paid under a fire insurance policy. The insurance company alleged that the McGorys had deliberately burned their home to fraudulently obtain insurance proceeds. This Court reversed a jury verdict in favor of the insurer, finding that the correct quantum of proof was a clear and convincing standard, as opposed to the preponderance of the evidence standard commonly used in civil cases. The Court concluded that the case was one for fraud, which has traditionally carried with it the higher quantum of proof. *See Beck Enters., Inc. v. Hester*, 512 So. 2d 672, 675 (Miss. 1987), *cited in McGory*, 527 So. 2d at 635 (other citations omitted). The Court reasoned that there was not enough to distinguish the typical fraud case from a civil arson case. The Court stated that the "[q]uantum of proof standards reflect the degree of confidence we demand for particular findings. They measure our willingness to risk error." *Id.* at 635 (citations omitted).

¶39. The present case is distinguishable from *McGory*. Since this action is not brought by a party alleging fraud upon them, it is different from a typical fraud case. *See Stewart v. Domestic Loans of Brookhaven, Inc.*, 199 So. 2d 444 (Miss. 1967); *Allen v. Thompson*, 248 Miss. 544, 158 So. 2d 503 (1963); *McMahon v. McMahon*, 247 Miss. 822, 157 So. 2d 494 (1963).

¶40. Generally, a party alleging fraud must prove that there was a false or misleading statement, and some reliance thereon by the victimized party. *McMahon*, 157 So. 2d at 501. For example, in Kansas, the court applied the rule that a beneficiary who has unlawfully killed an insured may not collect from the insurance company if that company can prove by clear and convincing evidence that the policy was fraudulently obtained, i.e. that the beneficiary procured or arranged procurement through an unknowing insured with the purpose of killing the insured to obtain the insurance proceeds. *Chute v. Old American Ins. Co.*, 629 P. 2d 734, 738-39 (Kan. Ct. App. 1981). If the insurance company, then, proves that it was misled to provide coverage under such circumstances, the insurance company can deny benefits because the insurance contract is void due to fraud. That case is similar to *McGory* where the insurance company alleged that the insured parties had obtained fire insurance with the intent of defrauding the insurance company by intentionally setting fire to the property.

¶41. In this case, however, the elements of fraud are not present or necessary to the determination. The insurance companies are not seeking to deny coverage, but, instead, interpled the funds to make payment on what they considered to be valid insurance contracts, not contracts that are voided due to fraud. The dispute in this case is among the potential beneficiaries. Therefore, this case does not involve an allegation of fraud. This dispute is simply to determine a rightful beneficiary to the interpled funds. The only thing that need be proved in this case is that Bryan wilfully procured the death of his wife without justification at law. *Gholson*, 48 So. 2d at 605.

¶42. There are also public policy considerations which favor use of the preponderance of the evidence quantum of proof. *Gholson*'s pronouncement that a person who had unjustifiably taken the life of another could not make claim to life insurance benefits rested on sound public policy, as stated in Miss. Code. Ann. § 91-1-25 (1994), which prohibits inheritance by an heir who wilfully causes or procures the death of a decedent. *Gholson*, citing the predecessor statute, extended that public policy to establish the controlling principle that neither should a "guilty" party make claim to life insurance proceeds. 48 So. 2d at 604. There is a strong public policy against allowing someone to procure the death of another and then profit from the illegal act. Public policy weighs heavily against requiring a heightened quantum of proof than that normally required in a civil suit, preponderance of the evidence.

## CONCLUSION

¶43. The correct legal standard was applied in this case. The judgment of the Chancery Court of Lowndes County that Bryan Dill wilfully and intentionally caused the death of his wife and should not be entitled to any of the interpled life insurance funds is based on substantial evidence and is **AFFIRMED.**

¶44. **AFFIRMED.**

> **PITTMAN, C.J., SMITH, MILLS AND COBB, JJ., CONCUR. BANKS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McRAE, P.J., AND DIAZ, J. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY BANKS, P.J., AND DIAZ, J. EASLEY, J., NOT PARTICIPATING.**

> **BANKS, PRESIDING JUSTICE, DISSENTING**:

¶45. Because in my view the correct standard of proof to be applied in this case is the higher clear and convincing evidence standard, I would reverse and remand for the chancellor to review the evidence applying this heightened standard of proof. Accordingly, I respectfully dissent.

¶46. While I respect the chancellor's analysis and am sympathetic to the argument of the Estate and the minor child that the law should not protect someone who attempts to profit by procuring the death of another, there also remain valid reasons for maintaining a heightened quantum of proof. This action is of a quasi-criminal nature and will prevent recovery or inheritance by Bryan if the chancellor finds that he procured the death of his wife. By analogy, we have held that there is a heightened standard of proof for adultery as a ground for divorce since such a finding may hinder an award of alimony to the guilty party. Also, like fraud and embezzlement, a separate criminal cause of action may be maintained based on adultery. Miss. Code Ann. § 97-29-1 (2000); *McCraney v. McCraney*, 208 Miss. 105, 43 So. 2d 872, 875 (1950).

¶47. Ultimately, contrary to the majority's assertion, this case does involve a claim of a fraudulent action

against an insurance company. Dill's alleged act of conspiring with the Baldwins to kill Liz was an attempt to mislead the insurance companies in order to obtain life insurance proceeds and amounts to an attempt to defraud the insurance company. This Court's holding in *McGory* dictates that in a case involving fraud against an insurance company, the correct quantum of proof is by clear and convincing evidence. *See McGory v. Allstate Ins. Co.*, 527 So.2d 632, 635-36 (Miss. 1988). Using the rationale of *McGory*, I am unable to distinguish this case from any other insurance fraud case and unwilling to risk an erroneous determination in a case of quasi-criminal nature.

¶48. The Estate avers that, if he had used the higher quantum of proof, the chancellor would have still concluded that Bryan should not recover the insurance proceeds. As the Estate points out, the chancellor characterized the evidence of Bryan's involvement in the death of his wife as highly probable, overwhelming, and conclusive. He found that the case was one of circumstantial evidence and that it turned on Bryan's credibility. He specifically found that Bryan was wholly without credibility. Bryan's statements were evasive, inconsistent, ambiguous and incomplete, especially in light of the other evidence of his complicity in Liz's death. In addition, the Estate submits that both of the Baldwin brothers were convicted of capital murder under the beyond a reasonable doubt standard of proof based on less evidence than was admitted in this civil case. Nevertheless, the chancellor applied a preponderance of the evidence quantum of proof, finding that, more likely than not, Bryan had wilfully and intentionally caused the Liz's death. While the record indicates that the chancellor carefully considered the facts of this case, we may not uphold the judgment that was based on a preponderance of the evidence where our precedents indicate that a heightened standard is appropriate. Nor should this Court substitute its judgment for that of the trial court. While the chancellor may indeed come to some conclusion applying the proper standard, it is not for this court to assume that result. This case should be remanded to the chancellor for a new determination using the clear and convincing evidence quantum of proof.

**McRAE, P.J., AND DIAZ, J., JOIN THIS OPINION.**

**McRAE, PRESIDING JUSTICE, DISSENTING:**

¶49. The majority concludes that the proper standard of review in this case is a preponderance of the evidence standard in finding that the benefits to the company's insured should be denied. I dissent because the proper standard of review should be the clear and convincing evidence standard.

¶50. This case is not any different from any other fraud case, and our case law consistently shows that the burden of proof of a plaintiff proving fraud should be clear and convincing evidence. *Cotton v. McConnell*, 435 So. 2d 683, 685-86 (Miss. 1983) (citing *Alabama & V. R. v. Kropp*, 129 Miss. 616, 633, 92 So. 691, 693 (1922); *Aponaug Mfg. Co. v. Collins*, 207 Miss. 460, 478, 42 So. 2d 431, 436-37 (1949); *Parker v. Howarth*, 340 So. 2d 434, 437 (Miss. 1976); *Hamilton v. McGill*, 352 So. 2d 825, 831 (Miss. 1977); *Clement v. R.L. Burns Corp.*, 373 So. 2d 790, 795 (Miss. 1979); *Mosby v. Gandy*, 375 So. 2d 1024, 1028 (Miss. 1979)). *See also McGory v. Allstate Ins. Co.*, 527 So. 2d 632, 635 (Miss. 1988) (citing *Beck Enters., Inc. v. Hester*, 512 So. 2d 672, 672 (Miss. 1987); *Cherry v. Anthony*, *Gibbs, Sage,* 501 So. 2d 416, 420 (Miss. 1987); *Johnson v. Brewer*, 427 So. 2d 118, 126 (Miss. 1983) (holding "Mississippi Law requires that a party charging fraud prove his charge by clear and convincing evidence.").

¶51. The majority attempts to distinguish *McGory v. Allstate Ins. Co.*, 527 So. 2d 632, 635 (Miss. 1988) , stating "this action is not brought by a party alleging fraud upon them." The majority cites to three cases as

examples of typical fraud cases and states that this case is different because it only deals with to whom the insurance company will pay the funds. The three cases are *Stewart v. Domestic Loans of Brookhaven, Inc.*, 199 So. 2d 444 (Miss. 1967); *Allen v. Thompson*, 248 Miss. 544, 158 So. 2d 503 (1963); and *McMahon v. McMahon*, 247 Miss. 822, 157 So. 2d 494 (1963). Whether this action is brought by the insurance company or not is irrelevant. The element of fraud is in question in this case. Otherwise, there would have been no reason for the insurance company to interpled the funds. These cases concern fraud in various situations and apply the clear and convincing standard of proof.

¶52. In *Stewart*, this Court reversed the ruling of the chancellor, who denied Stewart a certain sum of money. This Court found that the appellees, the loan company and others, had failed to prove a charge of fraud and embezzlement by clear and convincing evidence, and therefore, they could not receive credit for the sum. Instead, this money belonged to Stewart. *Stewart*, 199 So. 2d at 444. This Court stated where a claim is made involving fraud or embezzlement, proof must be established by clear and convincing evidence before recovery may be allowed. *Id.* at 445 (citing *Allen* and *McMahon*). *Stewart* made no distinction as to who brought the claim, as the majority alludes to, that would distinguish it from the present case. In addition, *Stewart* cited *Allen* and *McMahon* for support of the clear and convincing standard to be applied in cases of fraud.

¶53. Also, in *McMahon*, McMahon's amended complaint alleged that a quitclaim deed was secured by fraud and duress by the appellee. *McMahon*, 157 So. 2d at 496. The Court concluded fraud must be proven by clear and convincing evidence. *Id.* at 499. In *Allen*, a real estate case, it was undisputed that Allen had the burden of proving the elements of his complaint alleging fraud by clear and convincing evidence. *Allen*, 158 So. 2d at 504, 508-09. In stating this conclusion, *Allen* quoted a 1907 case, *Locke v. Friedman, Keiler & Co.*, 90 Miss. 3, 4-5, 43 So. 673, 674 (1907), establishing this state's long history of recognizing the clear and convincing standard for proof for fraud.

¶54. Quantum of proof standards measure our willingness to risk error, and they reflect the degree of confidence a court will demand for particular findings. *McGory*, 527 So. 2d at 636. This case is not any different from any insurance case where an element of fraud is in question. Bryan was never charged by the district attorney for the murder of his wife, Liz, but there was significant proof found by the trial court indicating Bryan either killed Liz himself or solicited the help of the Baldwin brothers to do it. The chancery court stated in its memorandum opinion, filed June 8, 1999, that, "[t]he existence of the conspiracy between the Baldwins and Dill is affirmed." In addition, in the chancery court judgment, filed the same day, the court stated, "The Defendant, Bryan Ellis Dill, shall not recover any of the interpled life insurance proceeds based upon his having intentionally and wilfully killed the insured, Mary Elizabeth Dill, his wife, by and through the agency of Darnell Baldwin and Clint Baldwin." Therefore, there is sufficient evidence of fraud in this case relating to the insurance policy in question.

¶55. For the above reasons, I dissent. I would reverse this case and remand it to have the chancellor apply the proper standard of clear and convincing evidence.

**BANKS, P.J., AND DIAZ, J., JOIN THIS OPINION.**

1. The Chancellor found that the statements were admissible evidence and, given the corroborating evidence, credible.